No. 16,894.

LESSER *v.* LESSER.

(250 P. [2d] 130)

Decided October 6, 1952. Rehearing denied November 17, 1952.

Messrs. RIFFENBURGH & HARDEN, for plaintiff in error.

Messrs. SOUTHARD & SOUTHARD, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE JACKSON delivered the opinion of the court.

IN a suit for rescission of a deed, plaintiff obtained favorable judgment and the losing defendant comes here, as plaintiff in error, seeking reversal. All parties involved bear the same family surname, Lesser. Reference is herein made to them by their christian names.

Jacob, the grantor in the deed and successful plaintiff in the trial court, was the father of Henry, the grantee. Henry's death occurred some fourteen months after the execution of the deed, and before the commencement of the present suit. His widow, Ida, being his sole surviving heir-at-law, is the defendant in this suit. Jacob at the time of the trial was about eighty years old. A German by birth, he used a dialect that prevented understanding with the available interpreter at the trial. Because of this the trial judge stated that the meagre testimony thus elicited from Jacob was practically valueless and was not to be taken into account in the court's findings and judgment. Thus there is presented the unusual case in rescission of a deed where the testimony of neither grantor nor grantee is available.

The record further discloses that Jacob, at the time of the execution of the deed, lived alone in Loveland on a small place subsequently appraised at $1,500. His son

Henry, who was one of a number of children of Jacob, lived in Greeley. Apparently he was the only child who took any interest in his father or kept in contact with him. He seems to have helped him in respect to some of his business affairs, including the payment of taxes and insurance, collection of proceeds of sales of fruit or other produce from his place, the handling of his laundry, and also seeing that he was properly supplied with groceries and other necessities. His out-of-pocket expenditures on behalf of his father, prior to the execution of the deed, are not shown. This visiting of Jacob by his son Henry had occurred over a considerable period of years.

September 22, 1949, Frieda Conrey, a niece of Jacob who lived on a neighboring place, found him in his bathroom quite violently ill and apparently in considerable pain, as a result of which he was somewhat incoherent in his speech. She and a neighbor lady helped him back to his bed and then called his son Henry in Greeley who immediately came over to see his father.

Carl W. Kibbey testified that, in response to a request from Dr. Datz, he drove his ambulance to the home of Jacob for the purpose of taking him to the hospital, but that Jacob resisted and refused to go. Kibbey reported this refusal to Dr. Datz. The first call was at ten-thirty in the morning. During the same morning Henry consulted Kibbey concerning the preparation of a deed running from Jacob to Henry conveying Jacob's home. In addition to owning and operating a mortuary and an ambulance service, Kibbey was also a notary public. He testified that he referred Henry to Hatfield Chilson, a lawyer in Loveland, who apparently did prepare a warranty deed running from Jacob as grantor to Henry as grantee conveying Jacob's home. Around the noon hour of the same day Henry and Kibbey again visited Jacob, where, with all three present, Henry showed Jacob the deed that had been prepared for his signature and a conversation then took place between Jacob and Henry in their German dialect which Kibbey could not

understand, but from their manner of speaking, in quiet and unexcited tones, it appeared to him that Henry was explaining to Jacob the nature of the document. Finally Jacob apparently signified his willingness to sign by nodding his head, and then took a pen and made his mark.

Kibbey further testified that he wrote the name of Jacob for the grantor on the same line as his mark. After he returned to his office he completed the acknowledgment on the deed. He further testified that, in addition to completing the acknowledgment, he signed the deed as a witness and asked Mrs. Weaver also to sign as a witness, which she did. The deed, which was introduced in evidence, shows a cross-mark, with Jacob's name written on the same line. It also shows the acknowledgment by Kibbey and the signatures of Kibbey and Mrs. Weaver as witnesses, and its recordation on the 23d day of September, 1949, in the office of the county clerk and recorder of Larimer County.

The evidence also shows that Jacob, upon a third visit by Kibbey in the evening of the same day, was persuaded to go to the hospital, Kibbey taking him there in his ambulance. After a three weeks sojourn in the hospital, Jacob seemed to have made a recovery from his illness and resumed living in his Loveland home, in the same fashion as previously, for a period of approximately one year and three months, at which time his son Henry died, December 25, 1950. Henry's widow, Ida, testified that at that time Jacob was drawing a pension for the blind, and that he might have been drawing it for some time previous. When the suit was filed Jacob was not living in his home in Loveland, but had moved to a home apparently in Greeley where he was recipient of a pension for the blind.

As to the question of Jacob's competency at the time of the execution of the deed, Kibbey testified that Jacob seemed to understand what he was doing. The testimony of Mr. and Mrs. Schneider, neighbors of Jacob, was to

the effect that they had never seen him when he did not seem to comprehend fully what he was doing, and they stated in substance that he at all times seemed to be mentally competent.

Ida identified checks drawn by Henry on his personal account totaling about $774.67 representing expenditures made on behalf of his father, Jacob, between September 22, 1949, and the time of Henry's death. She stated that she did not know, of course, what transactions had gone on and what sums Henry might have collected during that time on behalf of his father—such as the blind pension checks and payments for fruit grown on the place that might have been sold. Testimony also discloses, and it was not contradicted, that Henry maintained a bank account for Jacob in Loveland, while the checks he wrote from his own funds on Jacob's behalf were drawn on Henry's bank in Greeley. Ida testified that Jacob had operations on his eyes in 1950.

Ida's brother, Raymond Benner, testified that as early as 1945 he had accompanied Henry on numerous trips to Loveland to visit Jacob, at which times Henry would buy groceries and fuel for Jacob.

The trial court entered judgment holding the deed invalid, and ordered Ida to refund two months rent totaling $40 which she had collected from Jacob's home in Loveland after he had left it. Offsetting this, it ordered Jacob to refund the general property tax which Henry's estate had paid on Jacob's home.

The court's findings were generally in favor of Jacob. In a memorandum opinion it laid stress upon the fiduciary relationship existing between son and aged father, stating that this raised a presumption that the deed was invalid. This the court gave as one reason justifying the setting aside of the transfer, and as a second ground it stated that Jacob was mentally incompetent at the time he executed the deed.

The basic principle of law applicable to cases of rescission of deeds in this jurisdiction is that, before

rescission can properly be granted, the facts justifying it must be proved, not merely by a preponderance but by *more* than a preponderance of the evidence. In fact, the following cases held that the evidence must be beyond a reasonable doubt. *Wilson v. Morris,* 4 Colo. App. 242, 36 Pac. 248; *Robbins v. Nelsen,* 70 Colo, 504, 202 Pac. 707; *Berlin v. Wait,* 71 Colo. 533, 208 Pac. 482; *Roberts v. Roberts,* 113 Colo. 425, 158 P. (2d) 184.

We said in *Martinez v. Martinez,* 57 Colo. 292, 298, 141 Pac. 469, 472: "It is well settled that courts should be very guarded in setting aside duly executed instruments, by requiring clear and convincing proof of the facts upon which they are sought to be avoided. This does not mean proof to a certainty, but a mere preponderance of the evidence is not sufficient. The facts must be established beyond a reasonable doubt. *Wilson v. Morris,* 4 Colo. App. 242, 36 Pac. 248 [249]."

In *Wilson v. Morris, supra,* the court quoted with approval from Pomeroy's Eq. Juris., vol. 2, §859, as follows: "The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing, in the language of some judges, 'the strongest possible,' or else the mistake must be admitted by the opposite party; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error." After citing other authorities, the court further stated: "From these authorities, as well as from the universal current of the cases, it is plain to be seen that, wherever a party undertakes to avoid the effect of an instrument which he has signed and sealed, he undertakes a task of exceeding difficulty. He can only discharge the burden which is cast upon him by the production of the clearest, most satisfactory and indubitable proof that the defendant is without the right to enforce the contract which he holds."

The primary question in the case is then, Did Jacob sustain this burden that the law has placed upon him? His counsel undertook to do so by submitting the testimony of four witnesses. Mrs. Weaver, whose name appeared as a witness on the deed, testified that she did not see Jacob sign the deed but that she put her signature on the instrument as a witness at the Kibbey Funeral Home at the request of her employer, Kibbey, in the afternoon of the day on which the deed was dated. The second witness was Jacob himself, whose meagre testimony, elicited through an interpreter who for the most part could not understand him, the court itself has stated should be disregarded. The third witness, Frieda Conrey, a niece of Jacob, testified as to finding her uncle on the floor of his home on September 22, 1949, under the conditions already described. The fourth witness, Ida, was called as an adverse witness under the rule. It was her testimony that disclosed the confidential relation between Jacob and his son Henry.

An examination of this evidence of the plaintiff nowhere discloses that Jacob was mentally incompetent at the time that he executed the deed to his son. It would seem, therefore, that the sole result of the plaintiff's evidence in chief was to show that at the time the conveyance was executed there did exist a close, filial relationship between Jacob and Henry.

This close relationship between father and son is what the trial court stated raised a presumption of undue influence, so that "the burden of proof is upon the grantee to show that no undue influence was exerted and no undue advantage was taken of the grantor. Here the fiduciary and confidential relationship of son and father was clearly established to raise the presumption of invalidity." Citing Thompson on Real Estate, 6 Perm. Ed., sections 3030, 3035, 3039; also 16 Am. Jur. 461.

This confidential relationship raised a presumption against the validity of the deed signed by Jacob, and placed the burden of going forward with the evi-

dence upon the defendant. If she had offered no evidence the presumption thus raised, we have held in *Zink v. Carlile,* 126 Colo. 208, 248 P. (2d) 306, would have been sufficient to entitle plaintiff to favorable judgment. But defendant did introduce evidence rebutting that presumption, as disclosed by the Kibbey and Schneider testimony. The testimony of Raymond Benner and Ida also tended to show that there was a good and valuable consideration for Jacob's executing the conveyance to Henry.

As to what happens when evidence is produced rebutting what has been termed a presumption of invalidity of the conveyance is well expressed in Wigmore on Evidence (3d Ed.), vol. IX, section 2491, subparagraphs 2 and 3, pages 289, 290: "2. Nevertheless, it must be kept in mind that the peculiar effect of a presumption 'of law' (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary from* the *opponent.* If the opponent *does* offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule. 3. It is therefore a fallacy to attribute (as do some judges) an artificial probative force to a presumption, increasing for the jury the weight of the facts, even when the opponent has come forward with *some* evidence to the contrary. * * *" This distinction between the duty of going forward to offset a presumption and the assumption of the burden of proof, we have recognized in *White v. Hurlbut Grocery Co.,* 62 Colo. 483, 162 Pac. 1143, and *American Insurance Co. v. Naylor,* 101 Colo. 34, 70 P. (2d) 349, where we have stated that the burden of proof never shifts. See, also, opinion of Chief Justice Stone in *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U. S. 104, 62 Sup. Ct. 156, 161, 86 L. Ed. 89, 96.

Applying the rules of law to the facts in this pro-

ceeding, the burden of proving his case justifying rescission was at all times upon Jacob. It never shifted. His evidence seems not to have risen to that character required in a case of rescission, i.e., approaching a certainty or an overwhelming preponderance. The best that could be said for it is that, by disclosing a transaction between an aged and partially blind father and the only son in the family upon whom the father could put reliance, it may be considered to have raised a presumption of a fiduciary relationship between the father and son which cast the burden of going forward with some evidence upon the defendant indicating that the transaction was a fair one. Unlike the situation in *Zink v. Carlile, supra,* where defendant rested, here the defendant came forward with rebutting evidence. By this we do not mean to state beyond cavil that Henry did not exercise undue influence in obtaining the execution of the deed by his father. The possibility of such having occurred is there. But a second possibility, if not a probability, of what may have happened is well stated by Mr. Justice Brewer in *Mackall v. Mackall,* 135 U. S. 167, 171, 10 Sup. Ct. 704, 707, 34 L. Ed 84: "That the relations between this father and his several children during the score of years preceding his death naturally inclined him towards the one and against the others is evident, and to have been expected. It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounces. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and give to him, rather than the others, his property. To defeat a conveyance under those circumstances, something more than the natural influence springing from such relationship must be shown; imposition, fraud, importunity, duress, or something of that nature, must appear; otherwise that disposition of property which

accords with the natural inclinations of the human heart must be sustained. So that if this case turned simply upon the question of undue influence, compelling a voluntary conveyance, it would be difficult to find enough in the testimony to overthrow this deed."

One additional fact in this case bearing upon the validity of the deed is that no attempt was made by the grantor to set it aside during the life of the grantee. It was only after the hand of fate had decreed the death of the grantee prior to that of the grantor that the latter attempted to recall his act when its effect became apparent, of vesting the ownership of the property in one not related by blood.

The facts in this case do not supply the necessary requisites to support a rescission, i.e., certainty or proof beyond a reasonable doubt.

The judgment is reversed.

MR. JUSTICE STONE and MR. JUSTICE MOORE dissent.