## No. 20588.

WILLIAM J. WHATLEY *v.* DOROTHY STEVENS WOOD, ET AL.,
AND WALLACE E. MCGOWAN AS EXECUTOR OF THE
ESTATE OF IRENE MCGOWAN, DECEASED.
(404 P.2d 537)

Decided July 19, 1965.     Rehearing denied August 30, 1965.

Mincer and Larson, for plaintiff in error.

Lewis, Grant and Davis, Donald S. Stubbs, William P. Waggener, Zarlengo, Zarlengo and Seavy, Teller Ammons, for defendants in error.

*En Banc.*

Mr. Justice Sutton delivered the opinion of the Court.

We will refer to plaintiff in error, William J. Whatley, as plaintiff and to defendants in error, Dorothy Stevens Wood, et al., as defendants.

This action was originally commenced April 4, 1958, as a suit to quiet title to certain real property located in Garfield County, Colorado, amounting in the aggregate to 1899.60 acres of land. In a prior writ of error to this court *Whatley v. Wood,* (No. 19609), 148 Colo. 349, 366 P.2d 570 (1961), the instruments and, in fact, the entire transaction under which the defendants claimed title as individuals to the property in question were

set aside and the case was remanded to the trial court for further proceedings — the sole question remaining at that time was to determine the validity of the deed under which the plaintiff claimed his title.

In the first trial of this case one of the defendants, John V. Cuddy, obtained a summary judgment insofar as his leasehold interest in the real property involved was concerned and as a result thereof his case was heard in this Court under a separate and distinct writ of error, viz., *Whatley v. Cuddy*, (No. 19551), 148 Colo. 362, 366 P.2d 671 (1961). The Cuddy writ of error also resulted in a reversal. The case was re-tried in the District Court of Garfield County in August 1962. In the re-trial, the matter was again heard as a single case but in two separate stages or parts: first, concerning the validity of the Cuddy lease, and second, concerning the validity of the deed under which the plaintiff claimed his title. By ruling of the trial court during the re-trial of the case, the entire record and all exhibits in the former proceedings were automatically made a part of the record, evidence and proceedings in the re-trial. Separate judgments were again entered: one against plaintiff, William J. Whatley, in which his deed was held to be void, and the other against the defendant, John V. Cuddy, in which his lease was held to be void. The Cuddy portion of the case is again the subject of a separate writ of error (No. 20544). This opinion, howver, is concerned only with the judgment which decreed that the plaintiff's deed was void and that, therefore, the plaintiff has no right, title or interest in the real property in question.

Plaintiff alleges eight grounds of error for reversal only four of which we consider to be pertinent to the decision of the case. We summarize these grounds as questions in the following form:

(1) Did the defendants have sufficient interest in the subject matter to attack Whatley's title when they were named as defendants in the quiet title action?

(2) In order to invalidate the deed to the plaintiff, is it necessary that the evidence of value and breach of trust be clear, convincing and almost a certainty, or beyond a reasonable doubt; and, does evidence of such character exist in this case?

(3) Was the evidence as to value which the trial court received and relied upon improper evidence for the purpose of this case? And,

(4) Were the trial court's findings, upon which the judgment declaring plaintiff's deed invalid is based, supported by the evidence?

The facts necessary for understanding the issues are as follows: Plaintiff's father was the owner of ranch property that adjoined the land in question. The father, over a period of time, had acquired title to various unpatented mining claims in the area and subsequently applied for a patent on those claims. During that time, the father had contacted one Murphy whom he thought to be the owner of another group of unpatented mining claims adjoining the claims upon which he had applied for a patent. The reason for this contact with Murphy was to determine whether it would be possible to combine the claims so that a sufficiently large acreage could be assembled for the purpose of interesting possible future purchasers of oil shale lands.

Murphy died in 1953 before any further action was taken. During the succeeding two years several conferences were held between the father and Mrs. Murphy's lawyer but these were without fruition.

Sometime prior to 1958 it appears that the father had examined the original records in the general land office and discovered that an application to patent the claims in which he was interested had been rejected. After determining that there had been a final rejection of the patent application and that the time for appeal had expired, he then proceeded to examine the records to determine the title status of other unpatented mining claims in which he was interested. At this time he

learned of the possible title of the Colorado Carbon Company, a defunct corporation, in some unpatented claims and in the patented claims in question.

Prior to 1958, the father had also discovered that Richard E. Leach was the sole surviving director and trustee of the Colorado Carbon Company. Knowing that a conveyance from Leach was necessary to clear title to the properties held by the company, he proceeded to try to contact him. A search revealed that the elderly Leach was residing in California confined to a nursing home. Wishing to have it explained to Leach as to why a quitclaim deed to his son for the patented claims was desired from him as the company's sole surviving trustee, and, in order to take care of the father's desire for a separate deed and stock assignment relating to the unpatented claims not involved here, the father employed an attorney who was an old friend of Leach. The attorney then went to California to ascertain if he could secure Leach's signature to a deed to the son, as well as an executed deed to the father to the unpatented claims, and also a stock assignment. The contact was then made in California. On March 7, 1958, Leach executed the quitclaim deed involved here upon payment to him of a consideration of $150.

At the time the deed was executed, plaintiff knew that the property in question had a high potential value not only for oil shale purposes, but also for possible oil and gas rights as well as for the grazing rights. He knew that Leach was an elderly man who had been out of contact with the property since 1931 and, therefore, did not know the true value of the property, nor the situation as it existed in 1958.

It was with this knowledge that plaintiff sent his agent to California to secure a deed to valuable property for the price of $150 — which property an expert witness testified at the trial in 1958 to be worth somewhere between $30,000 and $75,000 providing it had

a marketable title and depending upon certain other factors.

We turn now to the four issues to be determined on this writ of error.

## I.

Plaintiff's first contention is that defendants did not have sufficient interest in the subject matter to attack Whatley's title when they were named as defendants in the quiet title action. The record discloses that defendants who appear here, also were defendants in the first writ of error in this case. In that action they were contesting plaintiff's claim of the title because they claimed to have a superior title based on one which was allegedly derived from a series of conveyances originating from two of the three directors of the company who were holding such position at the time the company became defunct in 1935. On the first writ of error we held that the defendants' claim of title based on the conveyance from only two out of three directors was invalid.

At the second trial defendants contend that they appear not as owners claiming under a deed, but as creditors and stockholders of the defunct Colorado Carbon Company.

On the first writ of error, title to the land in question was held to be in the creditors and stockholders of the defunct corporation, subject to the validity of the deed given by Leach and held by plaintiff. Thus, the present defendants, if they are stockholders or creditors or both, are proper parties to challenge the validity of plaintiff's title. Though their claimed status in this regard is vigorously challenged by plaintiff, the record discloses that they are, at least for purposes of this litigation, both stockholders and creditors. Such evidence appears in a written Stipulation (Exhibit I-2) and other exhibits as to the stockholders status and, in an admitted bankruptcy proceeding (Exhibit G) as well as in Admissions as to the creditor status. From this record

we conclude that plaintiff's various challenges as to this point are without merit.

II.

■■ Plaintiff's second contention is that to invalidate his deed from Leach the evidence must be clear, convincing and almost a certainty or beyond a reasonable doubt, and that no such evidence appears in the record. In this regard plaintiff directs our attention to several cases wherein such a rule of law is stated. E.g., *Martinez v. Martinez*, 57 Colo. 292, 141 Pac. 469 (1914); *Berlin v. Wait*, 71 Colo. 533, 208 Pac. 482 (1922); *Roberts v. Roberts*, 113 Colo. 425, 158 P.2d 184 (1945); *Lesser v. Lesser*, 128 Colo. 151, 250 P.2d 130 (1953). We certainly agree that such is the rule and that it is applicable here. The question though is: clear and convincing evidence of what? Here the record contains ample evidence of an inadequate consideration paid for a valuable purchase from an elderly, ill trustee. Plaintiff's difficulty is that the rule in applying clear and convincing evidence to the facts in the instant case is a well established rule of trust law. For when a trustee sells property for a grossly inadequate price, he has committed a breach of trust that may affect the title to the property in the hands of a purchaser. See: *Wormley v. Wormley*, 21 U.S. (8 Wheat) 421, 441 (1823); 2 *Perry on Trusts and Trustees*, § 770 (11th ed.); 54 Am. Jur., *Trusts* § § 436, 470. The rule is well set out in *Scott on Trusts*, Volume III, 2d ed., where it is stated:

"§ 298.4. *Adequacy of consideration*. The mere fact that the transfer of trust property is for a consideration which is of less value than the trust property does not prevent the purchaser from being a purchaser for value and from taking the property free of the trust. Where the difference in value is great, however, this is some indication that the purchaser knew or suspected that the transferor was committing a breach of trust or other wrong in making the transfer. In a number of cases the disparity has been found by the court to be a sufficient

indication in itself that the transferee must have had notice of the breach of trust. The inadequacy of the consideration, however, is not so clear an indication where the property is transferred on a forced sale as it is where the owner voluntarily transfers the property.

"The fact that the value of the consideration is insignificant as compared with the value of the trust property is evidence that the transaction was not a bargain but a gift. Thus if the transferee pays a merely nominal consideration for the property, even though it is shown that he had no reason to suspect the existence of a trust, he is a donee rather than a purchaser, and he cannot hold the property free of the trust."

██ The rule is that a trustee has a duty to determine the fair value of trust property before selling it. And, any sale of it for an inadequate consideration measured against its fair value may be subject to being set aside as a constructive fraud upon proper complaint being made. One test of whether such a sale should be set aside is whether there is some indication that the purchaser knew of the great difference in value which results in law in creating the breach of trust. If so, his status as a bona fide purchaser may be destroyed. *Scott, supra;* see also, *Beall v. Dingman,* 227 Ill. 294, 81 N.E. 366 (1907).

In the instant case plaintiff knew that Leach was the sole surviving trustee; he knew that Leach had been out of contact with the property and did not possess real knowledge of the surrounding circumstances as of the date of purchase; and, plaintiff also knew that the value of the property, even with the cloud on the title, was greatly in excess of the $150.00 that he had paid. With these facts as found by the trial court, the act of Leach in selling this property for such an inadequate consideration resulted in a breach of trust. In such a case, with his prior knowledge, plaintiff cannot claim the protective status of a bona fide purchaser in law. Accordingly,

we hold that the beneficiaries with such a showing were entitled to have the conveyance set aside.

### III.

Plaintiff's third contention is that the evidence relied upon by the trial court, in determining the value of the property in question, was improper for the purposes of this case. In this connection it is urged that the testimony of defendants' expert was based on a marketable title and, therefore, was improper because the court was dealing with a clouded title. We believe, however, that the value of the land with a marketable title does have some probative value in helping to determine how much a willing buyer would have paid for the land "as is."

Here Nielson, the expert witness, testified as to the value of the land in 1958, based on what a willing buyer would have paid for this acreage at that time. The testimony demonstrated that the property was worth somewhere between $30,000 and $75,000 with a marketable title, depending upon certain other factors such as oil shale lands like 1100 acres of this land being worth $30 per acre with an additional $25 per acre for oil and gas rights; or $25 an acre for oil and gas rights on the total area comprising 1899.60 acres. Moreover, the grazing rights on the land in question were worth about $6,000 in addition to the mineral rights. There is also evidence in the record that sometime about November 1958, plaintiff's father had sold approximately 4783.28 acres of land in the vicinity for future oil shale development for $290,000 on a four year contract, reserving the grazing rights. In any event, the trial court indicated it was cognizant of the fact that Nielson was speaking of salable land and took the title status into consideration in making his determination that the $150 was grossly inadequate compensation for the deed in question. Plaintiff's argument that he was only interested in the grazing rights and not the oil shale and gas rights, can avail him nothing here; for in determining value, the overall worth

is the important factor and the one that must be used to determine if an adequate consideration was paid. Suffice it to say, that we find nothing improper with the evidence received by the trial court which formed the basis for its decision that the price paid was grossly inadequate.

IV.

The fourth pertinent contention of the plaintiff is that the judgment is not supported by the evidence. This ground is also without merit. On writ of error, the sole inquiry on that issue is whether there is sufficient evidence in the record to sustain the trial court's findings. If there is sufficient evidence, we are bound by the trial court's determination even though it is possible for reasonable men to arrive at a different conclusion based on the same facts. *Hawkins v. Elston,* 58 Colo. 400, 146 Pac. 254 (1915); *Dohner v. Union Central Life Insurance Co.,* 109 Colo. 35, 121 P.2d 661 (1942).

The judgment is affirmed; however, the trial court is hereby directed to carry out the order of this court regarding the appointment of a receiver, sale of the property and reimbursement of expenses and costs as heretofore directed in our opinion *Whatley v. Wood,* 148 Colo. 349 at page 361.

Mr. Justice McWilliams not participating.