470 P.2d 593 (1970)
Egids SHIFFERS and Rasma Shiffers, Plaintiffs in Error,
v.
CUNNINGHAM SHEPHERD BUILDERS CO., a Colorado corporation, and Duke B. Shepherd, Defendants in Error.
No. 70-001. (Supreme Court No. 22171.)
Colorado Court of Appeals, Div. I.
February 10, 1970.
Rehearing Denied March 10, 1970.
George A. Hinshaw, Aurora, for plaintiffs in error.
Fred W. Vondy, Denver, for defendants in error.
Selected for Official Publication.
PIERCE, Judge.
This case was originally filed in the Supreme Court of the State of Colorado, and was subsequently transferred to the Court of Appeals under authority vested in the Supreme Court.
Plaintiffs in error were plaintiffs below and are referred to as such; defendants in *594 error were defendants below and will be referred to as such or as the Corporation or Shepherd.
We will first give a resume of some of the less controverted facts in this case.
In 1956 the Youngfield Heights Subdivision in Jefferson County was platted. The plat was approved by the County Commissioners and was duly recorded. In 1959, Jefferson County Highway Department personnel, apparently without formal authority, altered portions of Youngfield Street which is the northern boundary of Youngfield Heights Subdivision. While it appears that this alteration was not adjacent to the lot involved in this lawsuit, it did have the effect of changing the boundaries of the subdivision so that they no longer conformed with the recorded plat. Subsequent to the change in the location of the street, a portion of the subdivision in which plaintiffs' lot is now located was sold to defendant, Cunningham Shepherd Builders Co.; but the company was not notified of the changed boundaries.
Before constructing homes on the lots which they had purchased, Cunningham Shepherd had the property surveyed by a Mr. Lehti who informed them that he was unable to get "closure" by using the information supplied on the original plat. He could not specify anything wrong with the original plat; but was sure that the subdivision as it was located on the ground did not conform to the original plat. He submitted his own map of the subdivision as he staked it out and proposed that the plat be changed to reflect these changes. The house built on plaintiffs' lot (lot 4) was built in accordance with the Lehti survey. Lehti, apparently, had no knowledge of the change in the roadway.
Plaintiffs purchased the house and lot known as lot 4 from the defendant corporation in 1961. The lot was owned by the corporation at the time of sale; but the sale was handled through Duke B. Shepherd & Co., realtors, a company owned by the other defendant in this action. Mr. Shepherd was also an officer and stockholder in Cunningham Shepherd Builders Co.
A few weeks after plaintiffs occupied their home, a violent hail and rainstorm struck the area and the basement of the home was flooded to a considerable depth. Mr. Shepherd was informed of this, made arrangements for some remedial grading of the property, and informed the plaintiffs that the difficulty should not recur. Nevertheless, about one week later, a second violent storm struck the area and the basement was once again inundated. Mr. Shepherd was again informed. Although there is considerable dispute as to negotiations for remedying the grading problems on the rear of the lot, plaintiffs eventually had this work done at their own expense.
Further disputes arose between the parties regarding workmanship on the home, concerning the driveway, fireplace, the wiring, and several other alleged defects which we need not enumerate at this time. There was also a dispute regarding replatting and the necessity of obtaining easements from neighboring lot owners.
In 1962 the plaintiffs filed suit against the defendants, seeking damages of $52,000 plus $8,500 in punitive damages.
Defendants filed what was, in effect, a general denial to all the allegations and they counterclaimed for anticipated damages of $2,500 resulting from the necessity of defending this suit and sought dismissal of the plaintiffs' complaint. Plaintiffs later added an additional claim for relief, alleging that Cunningham Shepherd Builders Co. was a sham corporation for whose debt defendant, Duke B. Shepherd, should be personally liable. This claim was dismissed and the plaintiffs' motions to have it reinstated were denied.
After very extensive pretrial discovery, the matter was tried to the court which, after hearing considerable evidence entailing more than 1,000 pages of transcript and numerous exhibits, made extensive findings of fact and law and found for defendants. The court dismissed defendants' counterclaim.
*595 The briefs and arguments of counsel indicate the following problems which we should determine:
1. Did the trial court err in failing to grant relief for damage allegedly caused by latent soil defects?
2. Did the court err in finding that the plaintiffs had failed to sustain their burden of proof as to the alleged encroachment of their house on adjacent property?
3. Did the court err in finding that good and workmanlike methods were used in the construction of the structure itself?
4. Did the court err in failing to find that the defendants were liable to the plaintiffs for damages resulting from the flooding of the plaintiffs' basement due to the alleged negligence of the defendants?
5. Should the court have awarded the plaintiffs damages for their expense incurred in correcting grading faults on the rear of their property?
We will answer these questions in the order stated above.
DID THE TRIAL COURT ERR IN FAILING TO GRANT RELIEF FOR DAMAGE ALLEGEDLY CAUSED BY LATENT SOIL DEFECTS?
The plaintiffs presented some evidence concerning the cracking of cement work on their premisesparticularly in the driveway. Their theory is, apparently, that these cracks were caused by the presence of some bentonite in the soil underlying their house. They claim that the defendants intentionally concealed this fact from them.
Plaintiffs introduced evidence indicating the presence of bentonite in the soil and testimony regarding the heaving and settling propensities of bentonite in relation to moisture. They made absolutely no showing as to the amount of bentonite present in this particular soil.
Defendants' evidence indicated that, although bentonite was present in the soil on lot 4, it was present throughout that entire area of Jefferson County and that the defendants' construction methods were commensurate with those used elsewhere where bentonite is found.
We have found no authority, and none was cited to us, indicating that the mere presence of an undisclosed amount of bentonite constitutes a "soil defect," per se. Cases cited by the plaintiffs allowing recovery for damages caused by latent soil defects have done so only upon a finding that a soil defect existed. In Cohen v. Vivian, 141 Colo. 443, 349 P.2d 366, (1960), the defect was that the soil was composed of noncompacted trash, refuse, etc., covered by a layer of dirt. In Glisan v. Smolenske, 153 Colo. 274, 387 P.2d 260 (1963), a defect was specifically found although its nature was not specified. In Newcomb v. Shaeffler, 131 Colo. 56, 279 P.2d 409 (1955), the defect was a high degree of calcium carbonate in the soil, which dissolved in water and, consequently, caused erosion of part of the soil on which the foundation was laid. This caused the foundation to settle and disintegrate, with obvious effects on the house resting upon it. In Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399 (1964), there was apparently no soil defect involved, but rather a defect in the foundation itself. In all these cases, however, the results were rapid disintegration of the house and a resultant unfitness for human habitation. We have examined the photographs of the alleged defects complained of in this instance which were admitted into evidence. It is apparent that neither defects, nor results, such as those in the cases cited by the plaintiffs, were shown in the instant case.
The court, upon consideration of the conflicting evidence in this respect, properly concluded that no soil defect existed and that there was no negligence in the construction of the improvementsthe context in which the matter of soil defects was raised. This finding was supported by evidence in the record, and we will not disturb it on appeal. Whatley v. Wood, 157 Colo. 552, 404 P.2d 537 (1965).
*596 DID THE COURT ERR IN FINDING THAT THE PLAINTIFFS FAILED TO SUSTAIN THEIR BURDEN OF PROOF AS TO THE ENCROACHMENT OF THEIR HOUSE ON ADJACENT PROPERTY?
In order to understand this controversy it is necessary to review, in some detail, three different surveys which were placed in evidence and to make some comparisons between them. The first document was the original recorded plat, which we will refer to as the "plat". This was followed by a survey which was performed by a Mr. Lehti, and which we will refer to as the Lehti survey. At a later date another survey was made by the Lane Engineering Company, which was introduced into evidence by the plaintiffs, and which we will refer to as the Lane survey.
Although the record is rather confusing on this issue, it would appear that all parties assumed that the original plat was not surveyed properly due to the fact that subsequent surveys would not "close" the subdivision, when using data taken from the original plat. We have reviewed the original plat very carefully. We find that it is a properly drawn instrument, and that when the distances and angles shown thereon are calculated, there is no apparent reason why there should be difficulty in obtaining "closure" in later surveys of this lot. The persons who conducted the Lehti and Lane surveys could say nothing other than that they could not obtain "closure" from data on the original plat; however, they were at a complete loss to explain at what specific points errors existed in the original plat. The explanation of this very confusing situation came very late in the trial when a witness, who was familiar with the subdivision prior to the time it was conveyed to the corporation, testified that the County had made an unauthorized change in the road which forms the northern boundary of the subdivision and had straightened out a curve at its westerly end. There is no indication in the record that the persons making the Lehti or Lane surveys were aware of this rather drastic change in boundaries, which fully explains why their surveys could not be made to conform with the plat.
The plaintiffs contend, and defendants concede, that plaintiffs were sold lot 4 as described in terms of the original plat; but that the house as built was based upon stakes set in accordance with the Lehti survey. Plaintiffs further contend that the Lane survey indicates that their house actually encroaches 1.1 feet onto the neighboring lot 5, and that, at best, the status of the boundary between lot 4 and lot 5 is unascertainable and will be until the subdivision is replatted. In this regard, there was further evidence that Mr. Shepherd had promised to attend to the replatting but that the same had not been accomplished up to the time of the arguments in this Court.
As a precautionary measure, the plaintiffs obtained an easement from the owners of lot 5. They claim damages for their expense in protecting themselves against a suit for encroachment.
The trial court concluded that the plaintiffs had failed to carry the burden of proving that there was an encroachment.
A minute inspection of the exhibits presented to the court and the testimony regarding them shows that there is a clear discrepancy between the plat and the later surveys as to the westernmost lots in the subdivision, and that, in particular, there is a considerable discrepancy between the platted location of lot 7, the westernmost lot, and its actual location. However, evidence also showed that lot 3, adjacent to the plaintiffs' lot, and on the eastern edge of the subdivision, conformed to the platted version thereof in all respects. This tends to indicate that any platting error is localized in the western part of the subdivision, and not in the eastern part, where plaintiffs' lot is located. In reviewing the recorded plat and the Lehti replat survey, we find that they apparently have the same starting point and that the dimensions and angles used in tracing one's way to lot 4 *597 from the east are identical. The only variation between the two that we were able to find is in the eastern boundary of lot 4, along which no encroachment is alleged. We have prepared a diagram as part of this opinion which compares the dimensions and angles of lot 4 as shown by the plat and the Lehti survey, and which indicates the comparisons which we were able to make from the evidence.

Our comparison indicates that the western boundary (line A-D in the diagram, supra, and the line along which the encroachment is alleged) is the same in both the plat and the Lehti survey. Points C and D on both correspond; the distance between them corresponds. Further, both show the same angle at point D; both agree with the distance between point D and point A along that angle; and both agree on the angle at point A. Therefore, both apparently agree on all points relative to the location of line A-D, the western boundary of lot 4. The Lehti survey shows a length of some three more feet along the plaintiffs' north boundary (line A-B). We do not know why, except that we note that Lehti has used a different angle at point C than that shown on the plat. Since the evidence shows that the plaintiffs' house was built with a seven-foot setback from the western line, on whose location both surveys apparently agree, there would seem to be no encroachment on the adjacent lot by their house, and the court had before it valid evidence to indicate that there was no encroachment.
To offset this evidence, the plaintiffs presented the Lane survey which indicates an encroachment on lot 5. We are not clear as to the beginning point of the Lane survey but the distances and angles indicate they probably started from the western end of the subdivision and attempted to make several adjustments in angles and distances in an attempt to conform to the original plat when it was found that they could not make the original plat *598 close. The Lane survey also bore this rather cryptic comment:
"Discrepancies exist in the plat of Youngfield Heights which affect the location of lot 4. Therefore, it should not be presumed that the boundary of lot 4 can be located without question. This survey represents only one of several possible locations of the boundary line of lot 4." (Emphasis added)
Where the court had before it the original plat and the Lehti survey, which would indicate no encroachment, as compared against the Lane survey which contained the caveat rendering it of dubious value, we hold that the trial court properly found, based on the evidence in the record, that plaintiffs failed to meet their burden of proof in showing an encroachment of their improvements upon lot 5, and that, therefore, the defendants were not liable.
DID THE COURT ERR IN FINDING THAT GOOD AND WORKMANLIKE METHODS WERE USED IN THE CONSTRUCTION OF THE STRUCTURE ITSELF?
The plaintiffs made numerous allegations regarding structural defects in the building itself. The parties presented highly conflicting evidence regarding these alleged defects, and, after a personal inspection of the premises, the court determined that the improvements were built in a good and workmanlike manner.
We agree with plaintiffs that there is an implied warranty of workmanlike construction. Our Supreme Court has made this clear in Carpenter v. Donohoe, supra, 154 Colo. at 83, 388 P.2d 402, where it stated:
"There is an implied warranty that builder-vendors have complied with the building code of the area in which the structure is located. Where, as here, a home is the subject of sale, there are implied warranties that the home was built in workmanlike manner and is suitable for habitation."
See also Glisan v. Smolenske, supra, and Humber v. Morton, Tex., 426 S.W.2d 554 (1968).
We have examined the many photographs of the structure and were only able to discern some relatively minor imperfections from the evidence available to us. For construction to be done in a good and workmanlike manner, there is no requirement of perfection; the test is reasonableness in terms of what the workmen of average skill and intelligence (the conscientious worker) would ordinarily do. Waggoner v. Midwestern Development, Inc., S.Dak., 154 N.W.2d 803 (1967); Fairbanks, Morse & Co. v. Miller, 80 Okl. 265, 195 P. 1083 (1921). Except as noted in the concluding question in this opinion, evidence in the record supports the trial court's finding, and we will not disturb it. Whatley, supra.
DID THE COURT ERR IN FAILING TO FIND THAT DEFENDANTS WERE LIABLE TO THE PLAINTIFFS FOR DAMAGES RESULTING FROM THE FLOODING OF THEIR BASEMENT BECAUSE OF ALLEGED NEGLIGENCE OF THE DEFENDANTS?
There is considerable conflicting testimony in the record regarding the proximate causation of the flooding of the basement and the attendant damage. There was sufficient evidence to justify the court's conclusion that the flood damage was not proximately caused by negligence of the defendants. We rule that this finding by the court was proper. Whatley v. Wood, supra.
SHOULD THE COURT HAVE AWARDED THE PLAINTIFFS DAMAGES FOR THEIR EXPENSES INCURRED IN CORRECTING GRADING FAULTS ON THEIR PROPERTY?
The plaintiffs introduced considerable evidence showing that the grading *599 done on the premises was done in an unworkmanlike manner. Their witness, Newman, a qualified engineer and surveyor, testified that, in his opinion, the premises had not been properly graded. He further stated that the slope of their grading inclined toward the house, rather than away from it, which caused water draining from the premises and from the roof to collect at the juncture of the land surface and foundation. The evidence further showed that when sufficient water had collected, it overflowed into the basement window wells and thence into the basement.
The defendants did not contradict this allegation of unworkmanlike grading. In fact, the defendants' supervising architect (who was called by the defendants as a witness) testified:
"Q Did you make an attempt to determine the adequacy of this drainage?
"A It didn't look like it would take care of the job. They have another problem out there, and that is that big hill behind it. There is a good deal of drainage from that hill too. I would say that present downspouts and gutter system are more than adequate to take care of an inch an hour of rain, but it didn't look like to me that proper grading had been done to take care of the water once it was on the ground, particularly in the back."
This observation was made by the witness even after the plaintiffs had done their remedial work.
The record indicates that the defendant Shepherd made one attempt to rectify this matter but that eventually plaintiffs had some work done on this problem. We feel that the grading of the premises on which a house is constructed cannot be divorced from the construction of the house itself when it is undertaken by the party responsible for the construction. That part of the total construction project, in the absence of conflicting evidence, was clearly unworkmanlike and affected the habitability of that portion of the building, and the trial court should have so found. To the extent that the court's finding of fact regarding the quality of construction covers alleged unworkmanlike grading, the finding is not supported by evidence in the record and is in error.
The only damage proven by the plaintiffs in this regard was the cost of the attempt at rectifying the improper grading, which was shown to be $231.16.
Under the circumstances in this case, the proper measure of damages is that amount which necessarily was expended to bring the grading to the impliedly-warranted condition. Glisan v. Smolenske, supra; Carpenter v. Donohoe, supra; Note, Implied Warranty of Fitness for Habitation in Sale of Residential Dwellings, 43 Den.L.J. 379 (1966).
The plaintiffs have argued that the "corporate veil" should be pierced, in this instance, and that the defendant, Shephard, should be held liable, personally. Our examination of the record indicates that the court properly determined that Mr. Shepherd was not personally liable for any of the alleged damages.
We hold, therefore, that plaintiffs are entitled to recover the sum of $231.16 from the corporate defendant by virtue of that defendant's breach of implied warranty of workmanlike construction in the grading of the premises.
Accordingly, and for the reasons stated above, we reverse the judgment of the trial court with regard to its finding on good and workmanlike construction in the grading of the subject premises and remand with directions to enter judgment for the plaintiffs in the amount of $231.16 and their costs expended; but we affirm the judgment of the trial court in all other respects.
SILVERSTEIN, C. J., and COYTE, J., concur.