530 P.2d 974 (1974)
A. A. & E. B. JONES COMPANY, a Colorado corporation, Plaintiff-Appellant,
v.
A. Rowland BOUCHER and Mary Kathleen Boucher, Defendants-Appellees, Security National Bank, a corporation, et al., Defendants.
No. 72-396.
Colorado Court of Appeals, Div. II.
October 30, 1974.
Rehearing Denied November 19, 1974.
Certiorari Denied February 3, 1975.
*976 James J. Johnston, Denver, for plaintiff-appellant.
Banta, Banta & Eitel, Tom L. Eitel, Englewood, for defendants-appellees.
Rothgerber, Appel & Powers, Robert S. Slosky, Nathaniel E. Butler, Denver, for amici curiae American Gen. Contractors of America, Inc. and American Gen. Contractors of Colorado, Inc.
Not Selected for Official Publication.
RULAND, Judge.
In this dispute between plaintiff, A. A. & E. B. Jones Company, (contractor) and defendants A. Roland Boucher and Mary Kathleen Boucher (Bouchers) relative to *977 construction of a personal residence for Bouchers, contractor appeals from a judgment awarding damages to Bouchers. We affirm. Because the case involves a standard form of contract used frequently by contractors, the Associated General Contractors of America, Inc., and the Associated General Contractors of Colorado, Inc., were permitted to file amicus curiae briefs.
The following facts are not disputed. Late in 1968, Bouchers engaged Henry Lacy to design a residence for them to be located on their property in Cherry Hills Village, Colorado. Subsequent to his employment, Lacy and then Bouchers conferred with representatives of contractor relative to construction of the residence. These discussions culminated in a written contract dated March 14, 1969. That contract consisted of the pre-printed American Institute of Architects standard form of agreement between owner and contractor where the basis of payment is "cost of the work plus a fee" and the American Institute of Architects General Conditions for Construction. Various provisions were drafted by the parties and included in the contract, including a provision wherein contractor agreed to construct the residence for a guaranteed maximum cost to Bouchers of $250,000, according to site plan drawings, foundation plans, and other preliminary drawings attached to the contract, and plans and specifications to be supplied thereafter by Lacy. Also included were additional provisions stating that the guaranteed price was subject to increase or decrease for revisions to the residence represented by change orders executed by the parties, as follows:
17.3 "It is understood that additional working drawing sheets, specifications, and supplementary conditions are being prepared by the Architect and upon completion will become a part of this Contract by written addendum approved by the parties. The Contractor shall cooperate with the Architect and Owner in the preparation of the final plans and specifications and shall notify the Owner and Architect if the Contractor believes that the cost of the work and materials required by the plans and specifications will exceed the maximum cost to the Owner under Article 6.2."
17.4 "Upon receipt of final and complete plans and specifications, Contractor will solicit bids from persons and organizations necessary to complete the project and shall deliver such bids to the Architect. The Architect will then determine, with the advice of the Contractor, and subject to the approval of the Owner, which bids will be accepted. Upon acceptance of the bids necessary to complete the project, the Contractor will prepare a detailed estimate of the cost of the project incorporating its own jobsite operations with such subcontract and material costs. Nothing herein shall be construed to limit Owner's rights under Article 6 of the General Conditions [which establishes the Guaranteed Maximum Cost]. The Contractor will not be obligated to approve the final and complete plans and specifications until the bids necessary to complete the project have been accepted by the Architect and approved by the Owner."
Following execution of the contract, contractor began construction and Lacy, with the assistance of Edwin Jones, Jr., (Jones), an officer for contractor, and Lacy's employee, Sergio Ruiz, continued to work on additional and revised drawings for the residence. On October 2, 1969, contractor and Bouchers executed change order no. 1 to the contract. This document purported to clarify the written contract as to what items would be covered in the residence and allowances were made for additional items to be included. The effect of the document was to increase the guaranteed price for construction of the residence from $250,000 to $341,871. Contractor was paid monthly based upon statements submitted and approved either by Bouchers or Lacy.
*978 Henry Lacy died in mid-December 1969. Contractor continued work on the residence until January of 1970, when it terminated work on the basis that additional information and agreements relative to construction were required. The parties attended a meeting on January 28, 1970, at which Jones presented an estimate of the cost required to finish the residence. At this meeting Stuart Ohlson was appointed as architect by Bouchers. Pursuant to this meeting Jones prepared a letter on March 9, 1970 (referred to herein as the March 9 letter), relative to completion of the residence which was ultimately signed and approved by Bouchers. As relevant here, the March 9 letter stated as follows:
"This letter will serve to define contract revisions for the construction of the A. R. Boucher Residence . . .. A certain amount of confusion has resulted from the death of Henry F. Lacy, Jr. in regard to the completion of subject residence. Some items concerning finish work have not been specified or described on drawings. It was anticipated that this work would be dealt with on a cost plus basis added to the initial contract sum through the issuance of appropriate change orders.
"On January 28, 1970, a completed cost estimate was provided by A. A. and E. B. Jones Company. This estimate totaled $662,258 plus General Contractor's additional fee for $18,000, resulting in a total sum of $680,258. In an effort to reduce this total sum the following deductions shall be made with the intention that with completed working drawings the finished cost of each item may be reduced and a new agreement entered into for the completion of these items.. . . [15 separate items are described in the letter at this point.]
"It is understood the General Contractor is authorized to proceed with the work as related to the present contract and to continue the work as evidence in Change Order #2 (Architect to process same as soon as possible), with the understanding that items outlined above, deleted at the present time, shall, upon the completion of working drawings and specifications increase the contract by those amounts required to complete those items.
"Figuratively, the amounts involved are recapped as follows:

Present contract amount $341,871.00
Change Order No. 2 192,200.00
 ___________
Revised contract amount 534,071.00
Original estimate on items deducted,
including GC fee, pending
reevaluation 146,187.00
 ___________
Cost estimate as of January 28,
1970 $680,258.00

"If the above conditions substantially reflect yours and those of the Owner's expectations for the completion of the project, please sign as designated and return one copy to our office." (emphasis supplied)
Construction was resumed and Bouchers continued to pay monthly statements submitted by contractor and approved either by the architect or Bouchers. The services of Stuart Ohlson were then terminated in May of 1970, and Norman Steenhoff was appointed as architect. Steenhoff served in that capacity until November of 1970. Thereafter, in lieu of an architect, Sergio Ruiz served as project coordinator. Having paid a total of $593,687.79, Bouchers discontinued payment on the monthly statements submitted by contracter in November of 1970. Ultimately contractor shut down the project in February of 1971.
By reason of Bouchers' failure to pay additional amounts claimed due, contractor filed a mechanic's lien in the approximate amount of $113,000 and later began this action against Bouchers. Defendants Cipra, Inc., Bell Plumbing & Heating Co., Denver Lumber Company, and Ace Tile Company, Inc., as subcontractors, also filed liens against the property by reason of contractor's failure to pay their respective accounts and intervened in the present case. In addition to proceedings to foreclose mechanic's liens, defendant Security National Bank cross-claimed against Bouchers for *979 the balance due on a promissory note secured by deed of trust against the Cherry Hills property for funds advanced for construction. The Bank also asserted the priority of its lien as against the lien of contractor and the other claimants.
In answer to contractor's complaint, Bouchers answered denying liability and asserted numerous counterclaims. In summary, Bouchers claimed refund of all payments to contractor in excess of $250,000, rental paid for a residence occupied by Bouchers while construction continued after the alleged completion date, $19,000 for a security firm employed to guard the residence after construction was stopped, damages of $200,000 for failure to complete the residence, and $175,000 to correct and remedy work done by contractor prior to the date the project was terminated.
The case was tried to the court without a jury. The court viewed the residence in connection with opening statements by counsel. Following a lengthy trial, the court made detailed and extensive findings of fact and conclusions of law. It determined the amounts and priorities of the other mechanic's liens claimants and entered judgment thereon. Subsequent to entry of judgment, these claims were satisfied by Jones and are not at issue here. The court further determined the amount of indebtedness from Bouchers to Security National Bank, entered judgment for the Bank, and authorized foreclosure of the deed of trust. That portion of the judgment is not appealed.
Relative to the issues posed by contractor's claim against Bouchers and Bouchers' counterclaims against contractor, the court determined that contractor had agreed to construct the residence for a total price of $543,071, together with certain additional items designated in the March 9 letter, for a total contract price of $560,416.88. The court further determined that contractor was in breach of its contract with Bouchers to provide a completed residence and that as a result of the breach, Bouchers were damaged and entitled to recover the sum of $100,000 as the sum necessary to complete the residence. Bouchers were also allowed to recover $34,270.91, representing the payments made to contractor by Bouchers in excess of the contract amount, as well as $4,000, representing rental paid by Bouchers on a rented residence for the months of July 1970 through February of 1971. The other claims of Bouchers were denied. The court also denied contractor any relief on its claim.
As will appear, contractor's position on this appeal is essentially that the evidence does not support the findings and conclusions reached by the trial court. Hence, it is necessary to reiterate basic principles governing appellate review.
Where, as here, the trial court serves as trier of fact, the credibility of the witnesses, sufficiency, probative effect, and weight of all the evidence as well as the inferences and conclusions to be drawn therefrom, rest within the province of the trial court, and its conclusions may not be disturbed on review unless so clearly erroneous as to find no support in the record. Thiele v. Colorado, 30 Colo.App. 491, 495 P.2d 558. Therefore, even if the record reveals a choice between two plausible views of the weight of the evidence or between conflicting inferences from the evidence, the trial court's view is controlling. Whatley v. Wood, 157 Colo. 552, 404 P.2d 537.

I. The Contract
Contractor contends that the contract price established by the court is manifestly erroneous and that the March 9 letter represented only an estimate of the cost required to complete the residence because the parties had modified the written contract from a guaranteed maximum price agreement to a cost plus contractor's fee arrangement. Contractor's arguments in support of this contention center on an alleged lack of plans and specifications and on the conduct of the Bouchers which it is asserted create a waiver and estoppel.

*980 A. Plans and Specifications

By Article 17.4 of the original contract, a detailed estimate was to be supplied by contractor after final plans and specifications were available. There is testimony to the effect that complete plans and specifications showing all requirements for finish of the residence were not available prior to March 9, and were never furnished contractor through the date the project was shut down in February of 1971. According to contractor, the March 9 letter indicates by its terms that it constitutes an estimate only and that the estimate is subject to revision upon receipt of final plans and specifications. Hence, contractor concludes that, since this condition precedent was never fulfilled by Bouchers or their architect, the March 9 letter could not establish a final contract price.
In construing the March 9 letter, the trial court correctly noted that the document was prepared by Jones, and thus any ambiguities must be resolved against contractor as author. See Granberry v. Perlmutter, 147 Colo. 474, 364 P.2d 211. Based in part upon the express language of the March 9 letter, the court found that the additional plans and specifications required by the letter were the plans and specifications for the 15 deleted items (if the parties later agreed to include these items in the residence) and for some finish items. The court also based this determination on evidence of the construction already completed as of March 9, the numerous plans and drawings then in existence, and the fact that Jones represented to Bouchers that they did not need an architect on the project after the January 28 meeting, because no basic decisions remained which required the assistance of an architect. The trial court also relied on Jones' testimony that he had spent in excess of 300 hours assisting Lacy in design of the house, from which the court inferred that additional plans and specifications were not required to fulfill contractor's obligations for construction of the residence.
While it appears that as late as May of 1970, Jones wrote to Bouchers requesting their decision on numerous items of interior finish for the residence, the trial court found that even if such information was not then available, nevertheless, the residence was not completed to the point where such decisions could be carried into effect. The court noted that at the time of its inspection, the residence was uninhabitable, and by way of illustration pointed out, inter alia, that only one water closet, one sink, and very few cabinets had been installed, many windows were missing panes, and wall coverings had not been applied other than in one room. There is evidence also that most, if not all, of the information requested in the May 1970 letter was otherwise available on existing plans and drawings, although it would have been necessary to compile the information because of the number of and revisions to existing drawings. Finally, the March 9 letter indicated that those "finish" items not specified on drawings would be handled by change order, and no change orders having been obtained or requested by contractor (with one exception discussed hereafter), the trial court in effect concluded that plans and specifications were available for all essential finish items.
Contractor contends that the language of the March 9 letter substantiates that Jones was submitting only an estimate of costs to complete the residence. While the term "estimate" is used, the trial court found, based upon the testimony and exhibits introduced, that Jones knew or should have known by January 29 and certainly by March 9, the cost of the project as indicated on the existing plans and drawings, and further, that Bouchers reasonably understood that the March 9 letter established the total cost of the residence. Conversely, if, as contractor contends, the contract was cost plus, the trial court noted that total cost figures used in change order no. 1 and the March 9 letter would have been superfluous.
In its brief on this appeal, contractor has listed numerous "changes" allegedly made *981 by Bouchers to support its argument that Bouchers may not rely on the March 9 letter as a binding agreement. However, our review of the record discloses that a substantial number of items alleged as changes in construction were made prior to the March 9 letter. As to other items of alleged change which occurred after March 9, the trial court found that it was not possible to determine whether the work constituted actual changes or substitutions to the contract and that such items were insignificant when compared to the total project and the total contract price. In addition, the monthly billings made no references to particular work or materials as relating to a "change" which required additional charges. On this basis, the court found that Bouchers were never advised and hence were not aware until the trial that the work referred to by Jones was treated as a "change" requiring additional charges over and above the price established in the March 9 letter.
There is competent evidence and there are reasonable inferences from such evidence to support each of the trial court's findings outlined above, and thus those findings may not be disturbed on this appeal. Linley v. Hanson, 173 Colo. 239, 477 P.2d 453.

B. Waiver and Estoppel
Following the March 9 letter, contractor continued to submit monthly statements to Bouchers which statements were paid through November of 1970 (making total payments at that point of $594,687.79), and Bouchers approved and promised to pay the monthly statements submitted after November of 1970, which represent the amount claimed due by contractor. Contractor asserts that all materials and work on the residence through the date the project was shut down were done at the request or pursuant to the direction of Bouchers or their agents. In addition, Bouchers at no time invoked the remedy provided by the written contract, namely, to refuse payment on the contractor's applications for payment and to discharge contractor. Based on the foregoing, contractor asserts that the trial court should have found that the parties, by their conduct, modified the written contract from an agreement to build the residence for a fixed maximum guaranteed price to an agreement to pay the contractor its actual cost plus a contractor's fee and that Bouchers have waived any right and are now estopped to assert to the contrary.
The trial court determined that the overpayments resulted from the dilemma faced by Bouchers in attempting to have the residence completed. The trial court found that to shut the project down and litigate the issues between the parties prematurely would have subjected Bouchers to possible loss of their entire investment through foreclosure by the Security National Bank. See Hi-Valley Constructors, Inc. v. Heyser, 163 Colo. 1, 428 P.2d 354.
In order for the doctrine of waiver to apply, it must be shown that Bouchers intentionally relinquished a known right. People v. Watrous, 121 Colo. 282, 215 P.2d 344. On the basis of the above findings, there was no intentional relinquishment of rights by Bouchers, and thus the trial court properly declined to apply the doctrine of waiver. Further, while the written contract allowed Bouchers to discharge contractor, this remedy, by the contract terms, is permissive, and for the reasons given by the trial court, there were adequate grounds for Bouchers not to invoke this remedy. Hence, by foregoing such remedy, Bouchers did not forfeit other available remedies.
As to the asserted estoppel, a litigant may not rely on the doctrine of estoppel when he has not acted in good faith towards his opponent. See Otte v. Pierce, 111 Colo. 386, 142 P.2d 280; Cantlay v. Olds & Stoller Inter-Exchange, 119 Cal.App. 605, 7 P.2d 395. By the terms of the contract, the contractor's obligation to the owner is described as one of trust and confidence. By the specific language of Article 17.3, contractor is obligated to notify Bouchers if contractor "believes that the *982 cost of the work and materials required by the plans and specifications will exceed the maximum cost." On substantial evidence, the court found that at the time Jones supplied Bouchers with a cash flow projection for the $250,000 contract price, Jones was preparing cost estimates and knew the residence would cost at least $360,000, and that at the time change order no. 1 was supplied to Bouchers reflecting an increased price to $341,000, Jones was preparing cost estimates totalling $560,000, without disclosing that information to Bouchers. On the basis of this finding, the court concluded that Jones had deliberately kept the Bouchers "in the dark" as to actual cost of the residence when Bouchers were relying on the prices established by change order no. 1 and the March 9 letter. In addition, the court concluded that contractor, knowing Bouchers were concerned about the cost of construction, dealt with them as if they "had a bottomless well of money." Hence, the trial court determined that contractor had not dealt in good faith with Bouchers. The record supports the trial court's findings, and on the basis of these findings it was proper for the court to refuse to apply a doctrine of estoppel against the Bouchers.
While Jones contends that he performed his duty to keep the Bouchers informed by relaying information concerning increased construction costs to Bouchers' architect Henry Lacy as the agent of Bouchers, we agree with the trialcourt that under the circumstances of this case contractor failed to discharge its obligation to Bouchers. Although Article 2.2.2 of the General Conditions to the contract provides that the architect will be the owner's representative and while Jones testified that he was instructed by Bouchers to deal directly with Lacy, Article 2.2.2 further provides that the architect's authority is limited by the other provisions of the contract. Article 17.3 specifically required contractor to advise both Lacy and Bouchers if it believed the cost of the residence would exceed the guaranteed maximum price.

II. Contract Extras
In addition to the price of $534,071 established by the March 9 letter, the trial court allowed contractor $10,614.75 for certain flooring and $15,731.13 for material cost on the exempted items set forth in the March 9 letter which were later included by the Bouchers for a total of $560,466.88. Contractor contends that it should have been awarded approximately another $147,000, representing its actual expenditures on the residence which Bouchers have not yet paid. However, this contention presupposes that contractor was working on a cost plus contract as opposed to a guaranteed maximum cost contract, which issue the trial court resolved on conflicting evidence against contractor.
In addition, the trial court found that: (1) Contractor failed to prove that the work done actually constituted changes as distinguished from substitutions to the contract; (2) even assuming the work constituted changes, there was insufficient evidence upon which it could determine the costs to be added to the contract; and (3) the contractor failed to obtain any change orders other than as to the increased cost for flooring which the court allowed, nor did contractor even advise Bouchers that the alleged "changes" would increase the contract price.
The trial court noted that the non-subcontracted work which contractor was to perform pursuant to change order no. 1 was projected at approximately $185,000. Conversely, on the basis of the contractor's present claim, Bouchers were charged in excess of $350,000 for non-subcontracted work, without any change in contractor's function and duty under the contract. The trial court found that contractor was unable to provide any satisfactory explanation of this "skyrocketing" increase. The trial court therefore concluded that, on this basis also, such increased costs could not be charged to Bouchers.
Here, again, the record supports the trial court's findings and hence those findings *983 may not be disturbed on this appeal. Linley v. Hanson, supra.

III. Contract Completion Date
In conjunction with the March 9 letter, Jones prepared a written "cash flow" analysis reflecting the amounts contemplated for construction of various phases of the residence for the total price shown in the March 9 letter. The document reflecting allocation of the contract price also projected the amounts which would be spent from March 9 through completion, and completion was shown as June of 1970. Based on evidence as to what was required to construct the residence in compliance with the March 9 letter and the cash flow projection, the trial court found that the completion date for the residence was June of 1970. Since contractor was aware the Bouchers were required to rent a residence, the trial court awarded Bouchers $4,000, representing rentals paid by Bouchers from July 1, 1970, through February of 1971 when the job was shut down.
Contractor contends that the completion date established by the trial court is manifestly erroneous because the Bouchers requested a reduction in work force, hired a third architect in July of 1970, and failed to furnish plans and make necessary drawings requested by contractor.
However, contractor does not challenge the trial court's finding that even as of February of 1971, when the job was shut down, all of the work contemplated by change order no. 1 had not been done; nor does contractor contend that this work could not have been completed by June of 1970. Moreover, based on the evidence before it, the trial court concluded that the delay was not the fault of Bouchers and that, in effect, contractor by diligent effort pursuant to its obligation as superintendent of the project could have completed the residence by June of 1970. Since there is competent evidence in the record to support this conclusion, it is binding on review. Hence, it was proper for the trial court to award Bouchers rental.

IV. Damages to Complete Residence
The trial court awarded Bouchers $100,000 in damages to complete the residence. Contractor contends there is no evidence in the record to support this award. Contractor relies on his prior contentions relative to nonexistence of plans and specifications, and thus concludes that it is not possible to determine the cost of completion.
While the evidence in a given case may reflect uncertainty as to the amount of damages incurred, the test is not whether damages may be ascertained with mathematical certainty but whether it has been established that a party was in fact damaged. If so, the trier of fact is obligated to make a determination based upon the available evidence. Peterson v. Colorado Potato Flake & Mfg. Co., 164 Colo. 304, 435 P.2d 237. Here the court relied in its findings on personal inspection of the residence, testimony relative to uncompleted items, and various exhibits. The trial court found (and contractor does not challenge here) that very little more of the physical structure had been completed by the time the job was shut down in February of 1971 than was contemplated at the time change order no. 1 was executed in October of 1969. The witness Ruiz testified to an estimate of $60,000 to finish the interior of the residence although he indicated that it was very difficult to arrive at an estimate. Conversely, contractor prepared an estimate of cost for completion prior to the present litigation which showed such cost to be in excess of $180,000. While this estimate covered some items which the parties had proposed to delete under the March 9 letter, the court specifically pointed out that it had excluded these items in considering this estimate in conjunction with the award of damages.
The evidence reflects in excess of 25 major items still to be completed on the interior *984 of the residence from such things as installation of doors, appliances, cabinets, to completion of flooring and painting of walls and installation of wall coverings. The evidence reflected numerous major items still to be completed on the exterior of the residence. Under these circumstances, we find no error in the trial court's award of damages.
We have examined contractor's other allegations of error and find them to be without merit. We therefore affirm the judgment.
Judgment affirmed.
SILVERSTEIN, C. J., and ENOCH, J., concur.