Ronald D. WIMMER and Norma
L. Wimmer

v.

**DOWN EAST PROPERTIES, INC. and
Peter M. Camplin.**

Supreme Judicial Court of Maine.

Sept. 20, 1979.

---

Erwin, Austin & Lucas, P. A., James S. Erwin (orally), Ralph W. Austin, York, for plaintiffs.

David N. Ott (orally), York, for defendants.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD and GODFREY, JJ.

GODFREY, Justice.

On December 12, 1975, Ronald and Norma Wimmer executed with Peter M. Camplin an agreement for the purchase and sale of certain land, with a house under construction on it, then owned by Down East Properties, Inc. Mr. Camplin is the president of Down East Properties, Inc., the grantor of the deed to the Wimmers.[1] Mr. Camplin and Down East are engaged in the business of building homes. Their customary method of operation is to build "on speculation," that is, to construct a house according to Camplin's design and sell it during or after construction. Substantial progress on the construction of the Wimmers' house had been made before the execution of the purchase-and-sale agreement.

The agreement provided that Down East Properties, Inc. would, at closing, convey title to two and one-half acres of land in York, Maine, including "a completely finished house with all water . . . systems operating in good condition." The agreement also contained the provision, "Well water is to be certified as usable for household use by the State of Maine or any reputable laboratory."

The closing took place on May 13, 1976. The Wimmers became dissatisfied with the well water soon after the closing and eventually began a civil action against both Down East Properties, Inc., and Peter Camplin, alleging inadequacy of the water system and certain other defects in construction. After a trial without a jury in Superior Court, York County, the presiding justice found in favor of the plaintiffs on four separate grounds:

(1) breach of an express term of the contract

(2) breach of implied warranty of workmanlike construction

(3) breach of implied warranty of habitability

(4) violation of the Unfair Trade Practices Act, 5 M.R.S.A. ch. 10 (§§ 206 et seq.) (1979).

Defendants appeal. The plaintiffs cross-appeal, contending that the award of attorney's fees is insufficient.

We affirm the judgment insofar as it finds defendants liable for breach of an express term of the contract and for breach of an implied warranty of workmanlike construction. We find it unnecessary to decide whether defendants were in breach

---

1. Mr. Camplin signed the agreement in his own name without reference to his agency for the corporation. The corporation later executed the deed to the Wimmers in the usual way, by Camplin as president. The parties and the trial court have treated the corporation and Camplin as both obligated by the purchase-and-sale agreement, presumably because Camplin was acting in fact as agent for his disclosed corporate principal when he made himself a party to the agreement by signing it with his own name.

of an implied warranty of habitability. We modify the judgment by striking the language declaring appellants liable for damages for violation of the Unfair Trade Practices Act, and we vacate that part of the judgment holding defendants liable for attorney's fees. We deny plaintiffs' cross-appeal and affirm the provision of the judgment holding plaintiffs liable on defendants' counterclaim for the unpaid balance of the price.

## I. *Breach of Express Contract*

██ The provisions of the purchase-and-sale agreement that related to the water system were not merged in the deed. Defendants' undertaking to construct a house was collateral to their undertaking to convey the premises and was not merged in their deed accepted by the Wimmers on May 13, 1976. *Lipson v. Southgate Park Corp.*, 345 Mass. 621, 189 N.E.2d 191 (1963); *Caparrelli v. Rolling Greens, Inc.*, 39 N.J. 585, 190 A.2d 369 (1963). Moreover, merely going into occupancy of the house did not automatically waive the Wimmers' right to damages for a breach of warranty by the builder-vendor. *See Aubrey v. Helton*, 276 Ala. 134, 159 So.2d 837 (1964).

██ The trial justice found that Down East Properties was in breach of its express contract in that the well was not "operating in good condition" and the well water was not "usable for household use." The justice found that at the time the property was sold the well water was not satisfactory, that the well had an inadequate flow and that the well casing was improperly sealed and of insufficient depth. There was competent evidence to support those findings.

Defendant Camplin took a water sample on April 27, 1976, and submitted it to the Maine Department of Health and Welfare to be tested. That test was reported unsatisfactory on May 7, 1976, because the sample contained two colonies of coliform group bacteria per 100 milliliters. On the back of the department's form for test reports, it is recommended that where two to four colonies are found another sample be submitted. Defendant Camplin took a second sample on May 5, 1976, reported satisfactory on May 10, 1976, registering only one colony of coliform group bacteria. The closing occurred on May 13, 1976. On May 17, 1976, Ronald Wimmer took a third sample which was reported unsatisfactory on May 27, 1976, with four colonies of coliform group bacteria. In addition, the Wimmers testified that two or three weeks after the date of closing, the water became murky, had an unpleasant odor and was unsuitable for household use. Their testimony was corroborated by that of the Wimmers' neighbors, the Prawdziks.

██ Robert Hanna, a contractor who drilled the Wimmers' second well, testified at a deposition that he tested the original well and found the rate of flow to be one and one-half gallons per minute, inadequate for household use. Hanna's deposition was admitted into evidence by agreement of the parties. The validity of Hanna's method of measuring the flow was disputed by defendants' subcontractor, Leon Partridge, who drilled the original well, but it was within the province of the trial justice, as fact finder, to resolve the conflict by concluding that the method used by Hanna was valid and the flow inadequate.

██ In his deposition, Hanna testified that because of the condition of the bedrock a fifty-foot casing was needed in his well to seal off surface water. The casing of the original well was only eleven feet deep. Although Partridge later installed a Jaswell seal, which also functions to seal off surface water, the Jaswell seal extended to a depth of twenty-seven feet. Partridge testified to hitting solid bedrock at twenty feet; Hanna testified that he drilled thirty-five or thirty-seven feet before he reached solid bedrock. Although the wells were fifty feet apart and the soil conditions were not necessarily the same, the evidence presented was sufficient to support the court's finding that the original well casing was inadequate.

██ Camplin and Down East contend that the existence of a breach of contract should be determined as of the date of closing. At that time, they had produced a

satisfactory water test, certified by the State of Maine. Furthermore, they argue, the problems as to the water's murkiness and odor developed two or three weeks after closing. It is true that a well contractor cannot be expected to guarantee forever the flow of pure water. If the well had been constructed properly and the problem had arisen after closing from unforeseeable acts of nature, there would have been no breach of contract. However, from the testimony in the record, we find no error in the trial court's conclusion that the problems with the water supply were caused by a defective or inadequate well casing, with the result that, at the time of closing, the water system was not "operating in good condition" as the contract required and appellants were in breach of the purchase-and-sale agreement.

■ In Maine, the standard measure of damages for defective performance under a construction contract is the difference between the value of the performance as rendered and the value of the performance as agreed on, *White v. Oliver*, 36 Me. 92 (1853). However, at least if the contract has been substantially performed and the deficiencies are not the result of the intentional deviation from the contract and can be remedied at a cost that is reasonable in relation to the contract price, the amount thus reasonably required to remedy the defect may be used as the measure of recovery. *Gosselin v. Better Homes, Inc.*, Me., 256 A.2d 629, 640 (1969). *See* Annot., 76 A.L.R.2d 805 (1961).

■ The presiding justice found the plaintiffs entitled to damages for the costs actually incurred by them in trying to remedy the defect in the first well and in having a second well drilled. Implicit in the justice's finding is a conclusion that the drilling of a new well was a reasonable means, in the circumstances, of remedying the defect. Such a conclusion finds support in the evidence adduced at trial. The Wimmers found the water unsatisfactory soon after the date of closing and complained about it repeatedly. The nature of the problem required that it be given prompt attention. The attorney for the appellees

wrote defendant Camplin a letter on June 4, 1976, requesting that he correct the inadequate water supply. Defendants' subcontractor, Partridge, examined the well water and advised the Wimmers that the water would clear up. Dissatisfied, the Wimmers had their attorney write another letter, dated June 24, in which they threatened to have a new well drilled at appellants' expense unless the well was fixed. A third letter, similar in content, was written on June 30. Finally, Partridge installed a Jaswell seal on the original well on July 13. When the Jaswell seal did not promptly remedy the problem, the Wimmers directed that Mr. Hanna drill another well, completed on July 23. We cannot say that the trial justice erred in his determination of the Wimmers' damages for breach of the express term of the contract.

## II. *Breach of Implied Warranty*

■ In *Gosselin v. Better Homes, Inc.*, Me., 256 A.2d 629 (1969), this Court held that in a construction contract with the owner of land, there is an implied warranty that the work will be performed in a reasonably skillful and workmanlike manner. The justice of the Superior Court concluded correctly that the *Gosselin* rule should apply equally to a builder-vendor of new houses. There is no good reason for distinguishing the contractor who builds for a landowner from the contractor who builds on his own land for the purpose of sale. The trial justice also ruled that a builder-vendor of new houses impliedly warrants that the house will be suitable for habitation.

Many recent cases hold, with little or no dissent, that in the sale of a new house by a builder-vendor, the law implies warranties that the house is suitable for habitation and constructed in a reasonably skillful and workmanlike manner. *E. g., Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399 (1964); *Norton v. Burleaud*, 115 N.H. 435, 342 A.2d 629 (1975); *Schipper v. Levitt & Sons, Inc.*, 44 N.J. 70, 207 A.2d 314 (1965); *Rothberg v. Olenik*, 128 Vt. 295, 262 A.2d 461 (1970). *See* Annot., 25 A.L.R.3d 383, § 6 (1969 & Supp.1978). Few business transactions are

more important to the buyer than the purchase of a new house. Yet many defects in construction do not become apparent to the average buyer until the sale has been closed and the buyer has lived in the house for a time. In a parallel situation in the sale of goods, where the buyer does not have a meaningful opportunity to inspect the goods before acceptance, the rule of caveat emptor is not followed. *See* 11 M.R.S.A. §§ 2–314, 2–315, 2–316 (1964 & Supp.1978–79). No satisfactory reason appears for applying a rule of caveat emptor in the sale of new houses by a builder-vendor.

▮▮▮▮ The presiding justice found that defendant Down East was in breach of the implied warranty of workmanship in that a leak around the chimney was the result of poor workmanship or inferior materials. Defendant Camplin conceded in his testimony that repair of the leak was the responsibility of Down East, and the defendants do not challenge the justice's factual finding. They argue that the existence of the leak did not constitute a breach of implied warranty because it was not a major defect.

Their argument confuses the implied warranty of habitability, breach of which requires that the defect be of sufficient magnitude to render the dwelling unsuitable for habitation, and the implied warranty of workmanlike performance, which requires only that a house be constructed in a reasonably skillful and workmanlike manner. The test is one of reasonableness, not perfection, the standard being, ordinarily, the quality of work that would be done by a worker of average skill and intelligence. *Shiffers v. Cunningham Shepherd Builders Co.*, 28 Colo.App. 29, 470 P.2d 593 (1970); *Waggoner v. Midwestern Development, Inc.*, 83 S.D. 57, 154 N.W.2d 803 (1967). The trial court did not err in awarding damages for repair of the leak around the chimney. Such a defect is within the scope of the implied warranty of workmanship.

The trial justice also found that the "house was not reasonably fit for habitation without a usable and adequate supply of water." Since the failure to install a water system operating in good condition consti-tuted a breach of an express provision of the purchase-and-sale agreement, for which the trial court granted recovery, we have no occasion on this appeal to decide whether the same failure constituted also a breach of implied warranty of habitability. In this case there is no difference in the measure of recovery.

## III. *The Unfair Trade Practices Act*

The trial court found that the defendants used an unfair or deceptive trade practice in the conduct of their trade, in violation of 5 M.R.S.A. § 207 (1979), by concealing from the Wimmers the unsatisfactory water test of April 27, 1976, breaching an implied warranty of habitability, and failing to remedy promptly the defective well after repeated notices that the well was defective. We have recently held in *Bartner v. Carter*, Me., 405 A.2d 194 (1979), that the private consumer's remedy under 5 M.R.S.A. § 213 (1979) is an action for restitution of benefits he has conferred on a defendant who by violation of section 207 has caused him to suffer loss of money or property. The only claim for restitution that the plaintiffs ever made during this litigation was a prayer, contained in Count III and again in Count IV of their complaint, that the sale be rescinded and defendants be ordered to accept a deed of the property from the plaintiffs. After including that prayer in their complaint, plaintiffs abandoned rescission as their desired form of relief throughout the litigation. The relief they actually pursued in Superior Court was not rescission—namely, disaffirmance of the contract and recovery of the price—but damages for breach of the contract and its implied warranties and for violation of the Maine Unfair Trade Practices Act.

Since, in fact, the action has not been one for restitution within the meaning of section 213 (*see Bartner v. Carter, supra*), it is unnecessary for us to decide whether the trial court was correct in finding that defendants' conduct constituted an unfair or deceptive trade practice under section 207. We intimate no opinion on the issues that might be precipitated by that finding if section 213 were applicable.

The damages found by the trial court to be the amount of loss plaintiffs sustained as a result of defendants' alleged violation of section 207 were plainly appropriate as damages for defendants' breach of the express provision of the contract relating to the water supply and for their breach of the implied warranty of workmanship manifested by the leaks around the chimney. On appeal, neither party has complained about particular elements taken into account by the trial justice in calculating damages; the arguments on appeal have addressed only the basic questions of liability. In the circumstances, we think it would serve no useful purpose to require on remand a reconsideration of damages. However, since the Wimmers have failed, under section 213(1), to establish their claim under section 207, they are not entitled to attorney's fees under section 213(2).

The entry is:

Defendants' appeal from the provision (paragraph numbered "2") of the judgment awarding an attorney's fee to the plaintiffs, sustained; plaintiffs' cross-appeal from the same provision, denied; that provision of the judgment, vacated.

Defendants' appeal from other provisions of the judgment, denied; paragraph number "1" of the judgment is modified to show that plaintiffs receive their judgment as an award of damages for breach of the contract and for breach of the implied warranty of workmanship; so modified, the judgment is affirmed in all its provisions other than the provision for an attorney's fee.

No costs on appeal are allowed to either party.

POMEROY, DELAHANTY and NICHOLS, JJ., did not sit.