**HANLIN GROUP, INC., Plaintiff, Counterclaim Defendant,**

v.

**INTERNATIONAL MINERALS & CHEMICAL CORPORATION, Defendant, Counterclaim Plaintiff.**

Civ. No. 89–0089–B.

United States District Court, D. Maine.

Sept. 7, 1990.

Michael N. Ambler, Jr., John J. O'Leary, Jr., Daniel E. Boxer, Stephen G. Grygiel, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for plaintiff, counterclaim defendant.

Daniel A. Pileggi, George Z. Singal, Gross, Minsky, Mogul & Singal, P.A., Bangor, Me., Constantine L. Trela, Jr., Thomas F. Ryan, Carol A. Doyle, Andrew Schlickman, Sidley & Austin, Chicago, Ill., Howard Post, Northbrook, Ill., for defendant, counterclaim plaintiff.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE

HORNBY, District Judge.

The United States Magistrate filed with the Court on July 26, 1990, with copies to counsel, his Recommended Decision on Defendant's Motion for Judgment on the Pleadings. On August 14, 1990, both plaintiff and defendant filed Objections to the Magistrate's Recommended Decision on Motion for Judgment on Pleadings. I have reviewed and considered the Magistrate's Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Magistrate's Recommended Decision; and I concur with the recommendation of the United States Magistrate for the reasons set forth in his Recommended Decision, and determine that no further proceeding is necessary.

It is therefore ORDERED as follows:

1. The Recommended Decision of the Magistrate is hereby ADOPTED.

2. The Plaintiff's Objections to the Magistrate's Recommended Decision on Defendant's Motion for Judgment on the Pleading are hereby REJECTED.

3. The Defendant's Objections to the Magistrate's July 26, 1990 Recommended Decision on Motion for Judgment on Pleadings are hereby REJECTED.

4. IMC's motion for judgment on the pleadings is GRANTED as to Count VIII (Continuing Nuisance), Count IX (Continuing Trespass) and those portions of Counts VII (Wrongful Involvement in Litigation) and X (Strict Liability for Abnormally Dangerous and Ultrahazardous Activities) which assert claims for punitive damages, and the motion in all other respects is DENIED.

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

DAVID M. COHEN, United States Magistrate.

In this action the plaintiff, Hanlin Group, Inc. ("Hanlin"), formerly named Linden Chemicals & Plastics, Inc. ("LCP"), asserts against the defendant, International Minerals & Chemical Corporation ("IMC"), a breach-of-contract claim arising out of a purchase agreement between LCP and IMC covering two manufacturing plants, one of which is located at Ashtabula, Ohio and the other at Orrington, Maine. Hanlin also asserts indemnity and contribution claims relating to response actions it has been required to take pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, as well as common-law claims for indemnity, contribution, strict liability, continuing trespass, continuing nuisance and wrongful

involvement in litigation. In addition to declaratory and injunctive relief, Hanlin seeks compensatory and. punitive damages and reasonable attorney fees. Before the court is IMC's motion for judgment on the pleadings on Counts I and III through X.[1]

Fed.R.Civ.P. 12(c) provides in part that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The First Circuit Court of Appeals has addressed the applicable standard for evaluating a Rule 12(c) motion:

> [B]ecause rendition of judgment in such an abrupt fashion represents an extremely early assessment of the merits of the case, the trial court must accept all of the nonmovant's well-pleaded factual averments as true and draw all reasonable inferences in [its] favor.... [T]he court may not grant a defendant's Rule 12(c) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."

*Rivera–Gomez v. de Castro,* 843 F.2d 631, 635 (1st Cir.1988) (citations omitted). *See also Lovell v. One Bancorp,* 690 F.Supp. 1090, 1096 (D.Me.1988), *appeal dismissed,* 878 F.2d 10 (1st Cir.1989) (on motion for judgment on pleadings, factual allegations in complaint must be taken as true and legal claims assessed in light most favorable to plaintiff; judgment warranted only if there are no genuine issues of material fact and moving party establishes that it is entitled to judgment as matter of law).

Accepting these guidelines, the facts for purposes of this motion are as follows: Between December, 1967 and April 30, 1982 IMC and/or Sobin Chemicals, Inc. ("Sobin") owned and operated a chemical manufacturing facility in Orrington, Maine.[2] Second Amended Complaint

---

**1.** By order dated April 25, 1990 the court (Carter, C.J.) severed and transferred to the United States District Court for the Northern District of Ohio all counts relating solely to the facility in Ashtabula, Ohio. Thus, Counts XI (misidentified in the order as Count IX) through XVI, although included in the defendant's motion for judgment on the pleadings, are no longer before

this court and will not be considered in this recommended decision.

**2.** IMC owned the facility from December, 1967 to January, 1971 and again from April 30, 1976 to April 30, 1982. Sobin owned and, with a wholly-owned subsidiary, operated the facility between January, 1971 and April 30, 1976. IMC

("Complaint") ¶¶ 2, 13–14, 18–21. At various times during this period IMC manufactured chlorine, caustic soda, sodium hypochlorite (bleach), chloropicrin and hydrochloric acid at the Orrington facility. *Id.* ¶¶ 18–21. As a result of its manufacturing processes and disposal practices, IMC from 1967 to 1970 released, discharged and disposed of mercury and mercury-contaminated sludge directly into the Penobscot River. *Id.* ¶¶ 29–40. As the result of the federal government's filing in July, 1970 of an action against IMC for illegal mercury releases and discharges and a subsequent consent decree entered into between IMC and the federal government, IMC agreed to limit its discharges of mercury and mercury components into the Penobscot. *Id.* ¶¶ 49, 51. Between July, 1970 and April, 1982 IMC established, owned and/or operated, at or near its Orrington facility, seven unlined landfills into which it deposited mercury and mercury-contaminated materials and sludge. *Id.* ¶¶ 56–70. IMC's construction, ownership, operation and closing of the landfills during that period resulted in the accumulation of mercury, mercury contaminants and other contaminants in the soils, subsoils, surface waters and groundwater at or near the Orrington facility, as well as in the Penobscot River. *Id.* ¶¶ 71–75. In connection with its manufacturing process, IMC used carbon tetrachloride which it disposed of in three of its landfills during the period from approximately December, 1970 to February 18, 1982. *Id.* ¶¶ 76–80. Such handling and disposal practices resulted in the accumulation of hazardous substances and contaminants, including carbon tetrachloride and chloroform, in the soils, subsoils, surface waters and groundwater at or near the Orrington facility. *Id.* ¶¶ 81, 86–88. IMC knew that its handling and disposal of mercury and carbon tetrachloride caused and would continue to cause contamination at or near the Orrington facility, its soils, subsoils, surface waters and groundwater, as well as the Penobscot River and its banks and sediments, and has failed to remove such contamination. *Id.* ¶¶ 88–90.

On April 30, 1982 IMC sold the Orrington facility to LCP pursuant to a purchase agreement. *Id.* ¶ 140. The agreement contains two indemnity provisions. *Id.* ¶¶ 141–42. Prior to the closing date, IMC concealed from LCP the nature and extent of the mercury contamination at the facility, its disposal of carbon tetrachloride and the existence of any carbon tetrachloride and chloroform contamination thereat. *Id.* ¶ 143.

On February 21, 1986 the EPA issued to LCP a draft consent agreement and order pursuant to § 3008(h) of the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), 42 U.S.C. § 6928(h). *Id.* ¶ 145. The notice which accompanied the draft order stated that the EPA's action was based upon its determination that hazardous waste released from the Orrington facility required certain response measures in order to protect human health or the environment. *Id.* ¶ 146. In response, LCP notified IMC that the latter was obligated under § 12.11 of the purchase agreement to pay for the current and future work the EPA required of LCP in connection with the RCRA notice and draft order and specifically requested full payment from IMC of the full cost of the work to be performed by an engineering consultant it had hired to assist it in responding to the same. *Id.* ¶¶ 149–50. On December 11, 1986 the EPA and LCP, with the prior knowledge and consent of IMC, entered into a consent agreement and order under RCRA. *Id.* ¶ 152. Although IMC paid to LCP $40,000 toward the cost of its consultant, IMC has refused to make any further payment of LCP's costs in responding to the RCRA notice and order. *Id.* ¶¶ 157, 160, 185. LCP has incurred or will incur engineering fees and costs, attorney fees and costs, expenses for its employees' labor and costs, as well as other expenses arising from or related to the contamination of the soil, subsoil, air, surface water or ground-

---

owned eighty percent of the stock of Sobin between January, 1971 and April 30, 1976. On the latter date Sobin merged into a wholly-owned subsidiary of IMC which, in turn, merged into IMC on June 27, 1978. Amended Complaint ¶¶ 14–16. Hereinafter references to IMC will include Sobin.

water at or near the Orrington plant. *Id.* ¶¶ 154, 158, 179, 184–85, 205–09, 224, 233, 240, 250–51, 255.

## I. BREACH OF CONTRACT (COUNT I)

■ IMC argues that Hanlin's indemnification claim for expenses incurred in complying with the EPA's order falls within the limitation-of-liability clauses of §§ 7.06 and 12.11 of the purchase agreement which exclude from indemnification liability claims arising from laws not in existence on or before the closing date. Because the contract specifies that it is to be construed in accordance with Ohio law,[3] the issue before the court is whether, taking the allegations of the complaint as true and viewing the legal claims in the light most favorable to LCP, the indemnification clauses can be construed under Ohio law as requiring IMC to indemnify LCP for its RCRA-order compliance costs.

Under Ohio law, "[t]he purpose of contract construction is to effectuate the intent of the parties." *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411, 413 (1987) (citing *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974)). Ohio courts will "resort to extrinsic evidence [in order to] give effect to the parties' intentions only where the language is unclear or ambiguous...." *Kelly*, 509 N.E.2d at 413; *see also Ohio State Life Ins. Co. v. Clark*, 274 F.2d 771, 777 (6th Cir.), *cert. denied*, 363 U.S. 828, 80 S.Ct. 1599, 4 L.Ed.2d 1523 (1960) (meaning to be given contract provision must be one which carries out intent of parties as determined by circumstances under which contract was made); *Wells v. American Elec. Power Co.*, 48 Ohio App.3d 95, 548 N.E.2d 995, 997 (1988) (if language of contract is capable of two reasonable, but conflicting interpretations, there is issue of fact on what the parties intended). Thus, I must first exam-

ine the indemnity provisions of the purchase agreement to determine whether the language shows exactly what the parties intended or whether it is instead ambiguous.

Section 7.06, the first of the two indemnity provisions, provides:

> Except as herein expressly provided, LCP shall have no obligation for any liability incurred by or arising from or related to the operation of the Business by IMC; and IMC will indemnify and hold harmless LCP from any and all loss or damage arising in connection with any such liability, including legal and other expenses reasonably incurred in connection therewith; to the extent, but only to the extent such liability is founded upon a state of facts and laws or regulations existing on or prior to the Closing Date.

Purchase Agreement ¶ 7.06 (Exh. A. to Original Complaint). Section 12.11, the second provisions, states:

> IMC hereby agrees to indemnify and hold harmless LCP, and anyone claiming under LCP, from and against any and all claims, expenses and damages, including all legal and other costs of defense thereof, arising from or related to any and all contamination of land, air or surface or ground water, including but not limited to mercury contamination, at or near the Orrington, Maine and Ashtabula, Ohio plants purchased by LCP hereunder, to the extent, but only to the extent, said claims, expenses and damages are founded upon a state of facts and laws or regulations existing on or before the Closing Date hereof.

*Id.* ¶ 12.11.

IMC argues that the RCRA order is founded solely upon 42 U.S.C. § 6928(h) which imposes corrective-action obligations on interim-status facilities.[4] It further as-

---

**3.** The purchase agreement states that it "shall be construed in accordance with and governed by the laws of the State of Ohio." Purchase Agreement ¶ 12.18 (Exh. A to Original Complaint). As a federal court sitting in a diversity action, this court must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021,

85 L.Ed. 1477 (1941). Under Maine choice-of-law principles, such a contractual choice of law would be honored, and Ohio law would be applied in matters of contract interpretation. *Lincoln Pulp & Paper Co. v. Dravo Corp.*, 436 F.Supp. 262, 268 (D.Me.1977).

**4.** This provision states, in relevant part:

serts that, because this amendment was not added to RCRA until November 8, 1984, Hanlin's claim for expenses and damages is "founded upon" a law not existing before the closing date, thereby excluding it from indemnity coverage under the contract. Hanlin, on the other hand, argues that the indemnity provisions mean that IMC will indemnify LCP and its successors for liability arising from or relating to the operation of the business by IMC unless such operation was not illegal prior to the closing date. Because the complaint alleges that IMC's disposal practices violated the law and because such illegal practices formed the basis for the RCRA order, Hanlin argues, the limitations of §§ 7.06 and 12.11 do not apply.

The issue, therefore, is whether the indemnification language of the purchase agreement compels the conclusion that Hanlin's claims are excluded from its coverage or, instead, lends itself to an interpretation which requires indemnification for liability resulting from IMC's allegedly illegal disposal practices even though the law pursuant to which the EPA actually brought its administrative action against LCP was enacted subsequent to the closing

date. I conclude that Hanlin's proffered construction of §§ 7.06 and 12.11 is a plausible interpretation of the contract. The indemnification clauses can reasonably be viewed as reflecting the parties' understanding that LCP might be potentially liable for abating chemical contamination at or near the Orrington facility under CERCLA which was in force at the time of the closing.[5] Under 42 U.S.C. § 9606(a)[6] the EPA has the authority (if it finds that a release or threatened release of hazardous chemicals poses an imminent and substantial endangerment to the public health or welfare or to the environment) to "compel a party to do whatever is required to remedy the dangerous situation." *United States v. Price*, 577 F.Supp. 1103, 1112 n. 9 (D.N.J.1983). Thus, the parties may have intended that IMC indemnify LCP and its successors for the costs and expenses resulting from an EPA order requiring a response action for the release of hazardous chemicals.[7] Accordingly, I find that, because IMC's proffered construction is not the only reasonable interpretation of the indemnification clauses, the intention of the parties is not clear from the language of the purchase agreement. Judgment on

> Whenever on the basis of any information the Administrator determines that there is or has been a release of hazardous waste into the environment from a facility authorized to operate under section 6925(e) of this title [addressing interim-status facilities], the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment....
>
> 42 U.S.C. § 6928(h).

**5.** The parties may also have been concerned that the state would bring an abatement action under a common-law claim for public nuisance or strict liability, *see, e.g. New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050–52 (2d Cir. 1985), or pursuant to Maine statute, *see* 38 M.R. S.A. § 1318–B(3) (authorizing Department of Environmental Protection to direct removal of hazardous waste contamination); 38 M.R.S.A. § 1365(5) (authorizing attorney general to bring action to "abate, clean up or mitigate threats or hazards posed or potentially posed by an uncontrolled [hazardous substance] site").

**6.** This section provides:

> In addition to any other action taken by a State or local government, when the President

> determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.
>
> 42 U.S.C. § 9606(a).

**7.** The consent agreement entered into between the EPA and LCP states that the EPA has determined that hazardous waste disposal at the Orrington plant "resulted in a release of hazardous waste into the environment from the facility." Consent Agreement and Consent Order ¶ 18 (Exh. H to original Complaint). The order further states that "[t]he response ordered and agreed to [under § 6928(h) ] is necessary for the purpose of protecting human health and the environment." *Id.* ¶ 19.

the pleadings, therefore, is inappropriate. *Lovell,* 690 F.Supp. at 1096; *see also Sellon v. General Motors Corp.,* 521 F.Supp. 978 (D.Del.1981) (motions for judgment on pleadings and summary judgment denied where evidence was needed to determine intent of parties in executing release).

## II. CERCLA CLAIMS (COUNTS III AND IV)

■ In Counts III and IV Hanlin asserts claims for relief under CERCLA. Count III is based on 42 U.S.C. § 9607(a) which, subject only to specific defenses set forth in the statute, imposes upon past owners or operators of hazardous waste facilities liability for necessary response costs incurred by any other persons. Count IV is brought pursuant to 42 U.S.C. § 9613(f)(3)(B) which provides, in relevant part:

> A person who has resolved its liability to the United States ... for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to [such] a settlement.

*Id.* Hanlin asserts that the consent agreement and order constitutes a settlement with the United States for response actions within the meaning of 42 U.S.C. § 9613 and that therefore it may seek contribution pursuant to 42 U.S.C. § 9613(f)(3)(B) from IMC which, it further asserts, is not such a settling party. Complaint ¶¶ 216–19.

IMC argues (as discussed above) that the contractual indemnity limitation provisions preclude, as a matter of law, indemnification by IMC pursuant to the purchase agreement. It further asserts that Hanlin's CERCLA claims also should be dismissed because, according to IMC, they are merely an attempt to circumvent the contract. Because I have already determined that the intention of the parties cannot be gleaned from the indemnification provisions of the purchase agreement, I cannot find, as a matter of law, that these provisions preclude Hanlin's CERCLA claims.[8]

## III. COMMON LAW INDEMNITY AND CONTRIBUTION CLAIMS (COUNTS V AND VI)

In its discussion of the statutory claims for indemnity, IMC states in a footnote that "Hanlin's ... common-law counts for indemnity and contribution ... should be dismissed for similar reasons." Memorandum of International Minerals & Chemical Corporation in Support of its Motion for Judgment on the Pleadings at 9 n. 4. It is well settled that "issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Collins v. Marina–Martinez,* 894 F.2d 474, 481 n. 9 (1st Cir. 1990). In any event, IMC's statement simply fails to demonstrate that "the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Rivera–Gomez,* 843 F.2d at 635 (quoting Fed.R.Civ.P. 12(c)).[9]

---

**8.** I note, however, that, even if the court were eventually to find that the parties intended to preclude from indemnification liability expenses incurred pursuant to the consent order, such a finding would not necessarily preclude Hanlin's CERCLA claims. In order to preclude Hanlin's recovery of response costs the court would have to find that the parties intended to allocate the risks of all response costs to LCP or its successors. *See, e.g., Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994, 1002 (D.N.J. 1988) (contract can, under appropriate circumstances, act to preclude recovery of response costs if there is express provision which allocates these risks to one of the parties, but indemnification clause which expired two years after closing was completely lacking in any language which expressly released the seller from future liabilities based on its hazardous waste disposal practices or imposed such liability on the buyer).

**9.** On June 11, 1990 IMC filed a motion for leave to file supplemental authority in support of its motion for judgment on the pleadings. Specifically, IMC seeks to bring to the court's attention the case of *Central Illinois Pub. Serv. Co. v. Industrial Oil Tank & Line Cleaning Serv.,* 730 F.Supp. 1498 (W.D.Mo.1990), in which the court there dismissed counterclaims for common-law contribution and indemnity on the grounds that the plaintiffs, as settling parties, were protected by a provision of CERCLA, 42 U.S.C. § 9613(f)(2), which protects parties which have settled with the federal or a state government from claims for contribution for matters addressed in the settlement. The court stated that, because "the contribution protection provisions serve the important function of encouraging

## IV. TORT CLAIMS (COUNTS VII THROUGH X)

The complaint contains claims for wrongful involvement in litigation (Count VII), continuing nuisance (Count VIII), continuing trespass (Count IX) and strict liability for abnormally dangerous and ultrahazardous activities (Count X).[10] IMC makes the following arguments in support of its claim that all of Hanlin's tort claims should be dismissed: (1) Hanlin is seeking to recover economic losses which are not recoverable in tort; (2) the doctrine of caveat emptor bars Hanlin's claims; and (3) Hanlin does not allege duties existing independently of the purchase agreement. I find these arguments unpersuasive.

■ IMC first asserts that, because Hanlin is seeking damages consisting in part of costs expended to remedy alleged environmental contamination to the property sold pursuant to the purchase agreement, it seeks to recover economic losses which it may not do in tort. According to this argument the chemically-contaminated land is analogous to a defective product and the losses sought are economic costs associated with repairing the "product." In support of its position IMC cites products-liability cases, *see, e.g., East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 870, 876, 106 S.Ct. 2295, 2301, 2304, 90 L.Ed.2d 865 (1986) (no products-liability claim lies in admiralty when commercial party alleges injury only to product itself which is an economic loss), and cases involving actions by home buyers against builders or developers for structural defects in new residential property, *see, e.g., Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982). Such cases do not involve actions for strict liability for an abnormally dangerous activity, nuisance or trespass and therefore do not support IMC's argument. *Cf. Crawford v. National Lead Co.,* 1989 U.S. Dist. LEXIS 3655, 19 Envtl.L.Rep. (Envtl.L.Inst.) 21,174 (S.D.Ohio Feb. 13, 1989) (bar on recovery for economic damages in products liability action did not apply to strict liability claim for abnormally dangerous activity).[11]

IMC also argues that the rule of caveat emptor as set forth in §§ 352 and 353 of the *Restatement (Second) of Torts* (1965) bars Hanlin's tort claims. Under this rule the vendor of land is not liable to his vendee for physical harm to the vendee or others while on the land caused by a dangerous condition of the land existing at the time of the transfer unless the vendor conceals or fails to disclose an unreasonable risk to persons on the land. Traditionally this rule was invoked to bar implied warranties in the sale of land. *Restatement (Second) of Torts* § 352 comment a (1965). The Maine Law Court has held, however, that "[n]o satisfactory reason appears for applying a rule of caveat emptor in the sale of new houses by a builder-vendor." *Wimmer v. Down East Properties, Inc.,* 406 A.2d 88, 93 (1979). Thus, the court has ruled that in the sale of a new house by a builder-vendor the law implies warranties that the house is suitable for habitation and constructed in a reasonably skillful and workmanlike manner. *Id.* In *Stevens v. Bouchard,* 532 A.2d 1028 (Me.1987), the court refused to extend an implied warranty of habitability to the seller of an older home. In that case the court held that the buyer of an older home could not recover on a breach-of-implied-warranty-of-habita-

---

early settlements," *Industrial Oil,* 730 F.Supp. at 1507, the provision provided protection from non-contractual indemnity claims as well as contribution claims against settling parties. In the absence of an objection by Hanlin I hereby grant IMC's motion. I find that since IMC is not a settling party within the meaning of 42 U.S.C. § 9613(f)(2) the *Industrial Oil* decision does not support IMC's claim that the plaintiff's common-law contribution and indemnity claims should be dismissed.

**10.** In choice-of-law questions arising in tort cases, Maine has adopted the "most significant

contacts and relationship" test of the *Restatement (Second) Conflict of Laws* § 145 (1971). *Kenerson v. Stevenson,* 621 F.Supp. 1179, 1180 (D.Me.1985) (citing *Adams v. Buffalo Forge Co.,* 443 A.2d 932, 984 (Me.1982). It is clear that Maine, rather than Ohio, law determines the rights and liabilities of the parties as to Hanlin's tort claims where the alleged conduct and injury both occurred in Maine. *See Restatement (Second) Conflict of Laws* §§ 145, 147.

**11.** Neither party has cited, and research has not disclosed, any Maine cases addressing this issue.

bility theory for a defective condition (leaking roof) and, in the absence of allegations of special relationship or of affirmative acts of fraud, that the caveat emptor rule barred a claim for failure to disclose a defective condition of an older home. *Id.*, 532 A.2d at 1030. The Law Court, however, has not had occasion to decide the applicability of the caveat emptor rule (and the exception for undisclosed dangerous conditions) in the context of claims for nuisance, trespass and strict liability for the chemical contamination of land by a vendor and the vendor's concealment of such contamination from the vendee. I conclude therefore that the doctrine of caveat emptor cannot be invoked at this stage of the litigation to bar Hanlin's tort claims.

■ Next, IMC argues that no tort exists because no duties exist independently of the purchase agreement. In *McNally v. Nicholson Mfg. Co.*, 313 A.2d 913 (Me. 1973), the Law Court stated, "In *tort*, obligations are created by virtue of the *status* relationships of persons in society and, therefore, the rationale of their existence is not only independent of consent but also precludes the effectiveness of consensual arrangements purporting to deny or limit the obligations." *Id.* at 923 (emphasis in original). The existence of the purchase agreement, therefore, does not by itself eliminate the plaintiff's strict liability, trespass and nuisance claims which assert IMC's breach of legal duties. Because the arguments presented by IMC fail to show that Hanlin is not entitled to relief on *any*

of its tort claims, I next examine the merits of each specific tort claim.

### A. Strict Liability for Abnormally Dangerous and Ultrahazardous Activities

■ IMC asserts that Hanlin's strict-liability claim fails because Maine law requires allegations of negligence even where the defendant was engaged in abnormally dangerous activities. In *Reynolds v. W.H. Hinman Co.*, 145 Me. 343, 75 A.2d 802 (1950), the Law Court held that where blasting is not only lawful but "useful, usual and probably necessary" and done under proper conditions, it is a reasonable use of property and therefore a showing of negligence is required. *Id.*, 145 Me. at 361–62, 75 A.2d at 811. The court's broad statement in *Reynolds* that "the only logical rule for this court to adopt is the rule that fault is a requisite for liability," *id*, 145 Me. at 361, 75 A.2d at 811, was not necessary to its holding that blasting was a reasonable—and, therefore, not an abnormally dangerous—activity. A finding that the disposal of hazardous wastes is an abnormally dangerous activity[12] for which the disposer may be held strictly liable is, therefore, not inconsistent with the actual holding of *Reynolds*. It is therefore possible that the Maine Law Court would hold that allegations of negligence are not required in a claim alleging strict liability for chemical contamination resulting from the disposal of hazardous chemicals.[13]

---

**12.** The complaint contains allegations, *see* Complaint ¶¶ 253–60, which, if proven, would allow a determination that IMC was involved in an abnormally dangerous activity at the Orrington facility. *See Restatement (Second) of Torts* § 520 (1977). *See also New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051–52 (2d Cir.1985) (New York court would find as matter of law that allowing corroding tanks to hold hundreds of thousands of gallons of hazardous waste constitutes abnormally dangerous activity); *Allied Corp v. Frola*, 730 F.Supp. 626, 633 (D.N.J.1990) (in light of known "pernicious" effects of carcinogens such as PCBs, disposal of by-products of petroleum recycling is abnormally dangerous activity); *United States v. Hooker Chem. & Plastics Corp.*, 722 F.Supp. 960, 966–67 (W.D.N.Y. 1989) (where it is undisputed that hazardous wastes have been released into environment,

holding that disposal of hazardous wastes by the generator was in itself abnormally dangerous activity was not unreasonable); *Amland Properties Corp. v. Aluminum Co. of Am.*, 711 F.Supp. 784, 807 (D.N.J.1989) (whether disposal of PCBs within factory building is abnormally dangerous activity depends on application of factors listed in § 520 of the *Restatement (Second) of Torts*); *State, Dep't of Envtl. Protection v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150, 160 (1983) (mercury and other toxic wastes are abnormally dangerous and the disposal of them, past or present, is an abnormally dangerous activity).

**13.** I also note that several years after its decision in *Reynolds* the Law Court in *Hayes v. Bushey*, 160 Me. 14, 196 A.2d 823 (1964), without citing *Reynolds*, did not foreclose the possibility of accepting the doctrine of strict liability

IMC further argues that Hanlin's strict-liability claim fails because Hanlin has not alleged injury to property other than that which LCP purchased from IMC. At least one court has rejected this argument:

> Defendants contend that these principles of [strict] liability are only applicable when actions on one's own property interferes with the rights of another holding adjacent or nearby property, not to the successor in title of the contaminated property.... We see no practical or legal distinction between the rights of a successor in title to use and enjoy its land and the rights of a neighboring property owner. Both have rights and both can suffer injury through the acts of a prior owner.

*T & E Indus., Inc. v. Safety Light Corp.*, 227 N.J.Super. 228, 546 A.2d 570, 576–77 (1988), *certificate granted*, 117 N.J. 119, 564 A.2d 848 (1989). The *T & E* court also noted that such liability may be altered in contract only if the purchaser knowingly accepts that burden. *Id.*, 546 A.2d at 577; *see also Allied Corp v. Frola*, 730 F.Supp. 626, 630 (D.N.J.1990) (under New Jersey law, predecessor landowner is absolutely liable under common-law principles to successor in title for environmental damage caused to property by predecessor, and "as is" clause in contract does not defeat such strict liability); *Amland Properties Corp. v. Aluminum Co. of Am.*, 711 F.Supp. 784, 803 (D.N.J.1989) (finding that Supreme Court of New Jersey would impose strict liability as between successive landowners for the undertaking of an abnormally dangerous activity). IMC has cited no cases in which a strict-liability claim was dismissed because the action was brought by the vendee against the vendor.

IMC argues, finally, that § 12.11 of the purchase agreement, which states, in relevant part, that IMC agrees to indemnify LCP from any claims "arising from or related to any and all contamination of land, air or surface or ground water, including but not limited to mercury contamination," Purchase Agreement § 12.11, shows that LCP knowingly accepted the burden of chemical contamination and accordingly altered IMC's liability by contract. *See T & E Indus., Inc.*, 546 A.2d at 577. The allegation that IMC concealed the nature and extent of mercury contamination as well as contamination by other chemicals, Complaint ¶¶ 143–44, is sufficient to raise an issue of fact concerning whether LCP had notice of an abnormally dangerous condition. In conclusion, the absence of any Maine cases involving claims of strict liability for chemical contamination caused by the disposal of hazardous chemicals, the legislature's recognition of the doctrine of strict liability for disposal or discharge of hazardous wastes and the acceptance by other jurisdictions of a cause of action for strict liability for the disposal of hazardous chemicals all lead me to conclude that Hanlin's strict-liability claim should survive IMC's motion for judgment on the pleadings.

## B. Continuing Nuisance

In Count VIII Hanlin asserts, in relevant part, the following:

> During its ownership and operation of the Orrington Facility, IMC caused the creation of a public and/or private nuisance by its generation, release, handling, storage and disposal practices concerning hazardous substances and contaminants including, without limitation,

for conducting an abnormally dangerous activity. Rather, the court, in rejecting the plaintiff's argument that the defendant should be held liable in an action for trespass conducting an extra-hazardous activity where the defendant's truck collided with the plaintiff's house, stated: "We neither intimate nor suggest what our holding might be in a case involving what might properly be deemed to be an extra-hazardous activity. It is enough to say that the mere operation of a semi-trailer truck along a public

highway does not fall into that category." *Id.* 160 Me. at 19, 196 A.2d at 826. Finally, I observe that the legislature's recognition of the concept of strict liability to the state for the cost of responding to the discharge of hazardous wastes, *see* 38 M.R.S.A. § 1319–J, or the creation of an uncontrolled hazardous substance site, *see* 38 M.R.S.A. § 1367, provides an additional reason for concluding that an action for strict liability for disposing of hazardous chemicals is not foreclosed under Maine law.

mercury, carbon tetrachloride and chloroform.

Complaint ¶ 236. The complaint also alleges that the nuisance continues, unabated, *id.* ¶ 237, and that LCP has incurred the expense of response action as well as losses in the value of its property and its right to use and enjoy its property, *id.* ¶¶ 238–40. I conclude that under Maine law Hanlin has not alleged any facts that would entitle it to relief on a claim for private or public nuisance.

■ Maine law has recognized a cause of action for a continuing private nuisance. Such an action will lie where the defendant's use of its land causes a continuing injury to adjoining or neighboring land. *See Pettengill v. Turo,* 159 Me. 350, 193 A.2d 367 (1963) (defendant's action in raising grade of driveway which resulted in flooding of plaintiff's adjoining land established continuing nuisance for which plaintiff could be compensated by successive actions at law or by seeking an abatement in equity); *see also Graham v. Lowden,* 137 Me. 48, 50, 15 A.2d 69, 71 (1940) (continuing encroachment by adjoining landowner is a private nuisance).[14] Although the Law Court has not had an opportunity to address whether such a claim lies in an action between successive landowners, other courts have consistently rejected such an argument. *See, e.g., Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 313–14 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985) (private nuisance claim is available to neighboring contemporaneous land users who have no opportunity to protect themselves through inspection and negotiation, but rule of caveat emptor prevents such a claim by purchaser against seller); *Allied Corp. v. Frola,* 730 F.Supp. at 634 (following *Amland* in refusing to extend New Jersey law allowing action for strict liability between successive landowners to action for private nuisance); *Amland Properties Corp. v. Aluminum Co. of Am.,* 711 F.Supp. at 808. *See also Cadillac Fairview/California, Inc. v. Dow Chem. Co.,* 1989 U.S. Dist.

LEXIS 5301, 19 Envtl.L.Rep. (Envtl.L.Inst.) 20,965 (C.D.Cal. Jan. 18, 1989) (purchaser cannot assert a private nuisance claim against property's seller because there is no unreasonable use of one's property to detriment of a neighbor's property and such a claim is also barred by doctrine of caveat emptor). I conclude that the Law Court would not recognize a cause of action for private nuisance between vendor and vendee.

■ An action for public nuisance is available under Maine law if the defendant has violated or threatens to violate a public right and the plaintiff has suffered an injury different in kind from that sustained by the public generally. *Smedberg v. Moxie Dam Co.,* 148 Me. 302, 305–06, 92 A.2d 606, 608 (1952). Maine cases have not directly addressed whether the pollution of a river constitutes a violation of a public right. In *Kennebunk, Kennebunkport & Wells Water Dist. v. Maine Turnpike Auth.,* 147 Me. 149, 84 A.2d 433 (1951), the Law Court, although citing *Pennsylvania R. Co. v. Sagamore Coal Co.,* 281 Pa. 233, 126 A. 386 (1924), *cert. denied,* 267 U.S. 592, 45 S.Ct. 228, 69 L.Ed. 803 (1925), which held that the pollution by an upper riparian owner of a source of public water supply was a public nuisance, did not decide whether or not the pollution of a brook used by a water district as a source of public water supply constituted a public nuisance because that issue was not before it. *But see Dudley v. Kennedy,* 63 Me. 465, 467 (1874) (obstruction of a navigable river is a public nuisance for which any person who is specially injured by such obstruction may maintain an action to recover damages); *Lockwood Co. v. Lawrence,* 77 Me. 297, 316 (1885) (upper riparian owner who pollutes river can be liable to lower riparian owners for creation of nuisance just as those who obstruct or divert such a waterway are so liable). Other courts have determined that there is a public right to have unpolluted waterways. *See, e.g., Philadelphia Elec. Co. v. Hercules, Inc.,*

---

**14.** An action for damages for public or private nuisance is also provided for by statute. *See* 17 M.R.S.A. § 2701.

762 F.2d at 316 (under Pennsylvania law there is a public right to "pure water," and pollution of river interferes with exercise of that public right); *see also Restatement (Second) of Torts* § 821B, comment g (1979) (if pollution of waterway interferes with use and enjoyment of that waterway by large number of persons, it becomes a public nuisance). The proscription by statute of the alleged conduct is another factor which may be considered in determining the existence of a public nuisance. *Id.* § 821B(2)(b).

In this case Hanlin's allegation that IMC discharged mercury and other contaminants into the Penobscot River, Complaint ¶¶ 35–40, 45–50, 54–55, as well as its allegations concerning the illegality of such discharges, Complaint ¶¶ 46–49, 53–55, 75, 82–89, 93, 195–202, sufficiently allege the violation of or interference with a public right. The issue then becomes whether Hanlin has alleged that it has suffered, in the exercise of that public right, an injury different in kind from that sustained by the public generally. Hanlin claims that its allegation concerning its property value loss as well as its impairment of its right to use and enjoy its property is sufficient to meet the special injury requirement. I disagree.

In *Smedberg,* the Law Court determined that the plaintiff's alleged loss of recreational business resulting from the rising and lowering of the level of a lake did not constitute an infringement of private rights since the plaintiff had the same right to use the lake as did the general public. *Smedberg v. Moxie Dam Co.,* 148 Me. at 310, 92 A.2d at 610. In *Burgess v. M/V Tamano,* 370 F.Supp. 247, 250 (D.Me.1973), *aff'd mem.,* 559 F.2d 1200 (1st Cir.1977), this court held that under general maritime or Maine law commercial fishermen and clamdiggers could maintain a private action for public nuisance where a tanker oil spill interfered with their right to take fish and harvest clams from the coastal waters of Maine, but that businessmen who claimed a loss of customers indirectly resulting from the alleged pollution of coastal waters and beaches could not. The *Burgess* court found that the cases in which commercial fishermen using public waters have been permitted to recover damages for the pollution or other tortious invasion of those waters stand for the general principal that "pecuniary loss to the plaintiff will be regarded as different in kind [from that suffered by the public generally] 'where the plaintiff has an established business making a commercial use of the public right with which the defendant interferes.'" *Id.,* 370 F.Supp. at 250 (quoting W. Prosser, *Law of Torts* § 88 at 590 (4th ed. 1971)). The loss of customers by the business owners, however, was found to be derivative of the loss suffered by the public at large and therefore did not allege the distinct harm required to support their public nuisance claim. *Id.* at 251 (citing *Smedberg*).

Although no Maine case has addressed the issue presented here—whether either response costs or loss of enjoyment and use of land alleges a distinct harm suffered in the exercise of a public right—other courts have held that such allegations do not meet the special injury requirement. In *Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d at 315–16, the court held that a jury could properly find that the leaching of chemicals into a river was a public nuisance but that the expense incurred in cleaning up the chemical waste alleged a special harm to plaintiff only in the exercise of its private property rights and therefore the plaintiff had suffered no *particular* damage in the exercise of a *public right* to have pure water. *Id.* 762 F.2d at 316. The court, in so finding, noted that the plaintiff had not claimed that it used the waters of the river or that it was directly harmed in any way by the river's polluted state. *See also Jersey City Redev. Auth. v. PPG Indus.,* 655 F.Supp. 1257, 1265–66 (D.N.J.1987) (following *Philadelphia Elec. Co.* in holding that under New Jersey law neither loss in use and development of plaintiff's property nor pecuniary loss suffered by plaintiff in complying with administrative order constituted damage suffered in exercise of public right to an uncontaminated environment); *Cadillac Fairview/California v. Dow*

*Chem. Co.,* 1989 U.S.Dist, LEXIS 5301, 19 Envtl.L.Rep. (Envtl.L.Inst.) 20,965 (citing *Philadelphia Elec. Co.*) (allegation that contamination of land destroys value of plaintiff's property and exposes plaintiff to liability for clean-up of site fails to allege special injury in exercise of right common to general public).

In this case Hanlin has alleged nothing more than did the plaintiffs in *PPG Industries* or *Cadillac Fairview/California.* I therefore conclude that, drawing all reasonable inferences from the complaint in favor of Hanlin, Hanlin nevertheless lacks standing to assert a claim for public nuisance.[15]

### C. Continuing Trespass

██ Count IX alleges, in relevant part, that "[t]he failure of IMC to remove from land and property in the possession of LCP at the Orrington Facility the contamination, including, without limitation, the mercury, carbon tetrachloride and chloroform which IMC placed there . . . constitutes a continuing trespass. . . ." Complaint ¶ 250. IMC argues that, because a claim of trespass will lie only if a person intentionally enters the land *in possession of another,* Hanlin's claim of trespass must fail since the complaint alleges essentially that IMC contaminated its own land before it sold it to LCP. Hanlin argues on the other hand that, because the complaint alleges that contaminants which IMC left in the soil (now owned by Hanlin) continue to leach onto the property, it states a claim for continuing trespass.

In *Hayes v. Bushey,* 160 Me. 14, 21, 196 A.2d 823, 827 (1964), the Law Court reaffirmed the established principle that the tort of trespass requires the entry onto land in the possession of another. In this case the complaint alleges that the chemical contamination was already there when LCP took possession. I conclude therefore that, absent any suggestion of an intrusion onto the land of another, an essential element of the tort of trespass is missing in this case.[16]

### D. Wrongful Involvement in Litigation

██ Hanlin has also brought a claim for wrongful involvement in litigation alleging, in relevant part:

By the wrongful acts of IMC, including, without limitation, IMC's practices concerning the generation, release, handling, storage and disposal of mercury, carbon tetrachloride and chloroform and other hazardous substances and contaminants at the Orrington Facility and its failure fully to disclose such practices to LCP before selling the Orrington Facility to LCP, IMC has involved LCP in litigation with the Administrator of the United States Environmental Protection Agency since February 1986 and has placed LCP in such relation to the EPA as has made it necessary for LCP to incur attorneys' fees and litigation expenses pursuant to the RCRA Order to protect its interest.

Complaint ¶ 231. IMC argues that no tort exists for wrongful involvement in litigation. Hanlin cites *Gagnon v. Turgeon,* 271 A.2d 634 (Me.1970), and *Restatement (Second) of Torts* § 914 (1979) (cited in *Gagnon*) in support of its claim.[17] I conclude

---

**15.** In so concluding I note that the special injury requirement would be rendered meaningless if every plaintiff could merely allege injury to the use and enjoyment of its property when such an allegation does not distinguish between injuries distinct from those suffered by the public generally and losses which are derivative of the loss suffered by the public at large.

**16.** *Regan v. Cherry Corp.,* 706 F.Supp. 145 (D.R.I.1989), cited by Hanlin, is inapposite. *Regan* involved the disposal of waste onto property adjacent to that in the possession of the defendant. The court held that under Rhode Island law a party can bring a claim of continuing trespass for chemicals disposed of by the defen-

dant on the plaintiff's land even though the plaintiff did not own the land at the time the chemicals were deposited. This case did not involve an action between vendor and vendee.

**17.** Hanlin claims that Maine, in accordance with § 914 of the *Restatement,* has recognized the *tort* of wrongful involvement in litigation. Neither the decision in *Gagnon* nor the *Restatement* identifies an independent tort of wrongful involvement in litigation. Rather, both have recognized as a valid claim for *damages* the expenses incurred in litigation with a third party if they are "the natural and probable consequences of [the defendant's tortious] act." *Gag-*

that Hanlin's claim, insofar as it states a prayer for relief for damages, should not be dismissed. In *Gagnon*, the Law Court concluded that, where the tortious act of a defendant (malicious interference with the contractual relationship between the plaintiff and a third party) had involved the plaintiff in litigation with the third party, the defendant was liable to the plaintiff for the expenses necessarily incurred by the plaintiff in protecting his interest, including attorney fees. The *Restatement* provides the following as a rule of damages concerning expense of litigation:

(1) The damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of the litigation.

(2) One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

*Id.* § 914. Thus, if Hanlin recovers a judgment in its favor on its claim of strict liability it will be entitled to recover attorney fees and litigation expenses incurred in connection with the RCRA order to the extent it is able to establish that they were a natural and proximate result of such tortious acts.

## V. PUNITIVE DAMAGES

■ IMC asserts that the punitive-damage claims should be dismissed because punitive damages are not available for breach of contract and the complaint alleges nothing more than a breach of contract. Under Maine law punitive damages are available "'based upon tortious conduct only if the defendant acted with malice.'" *Pombriant v. Blue Cross/Blue Shield of*

*non,* 271 A.2d at 635. Thus, such a claim for damages must attach to some underlying tort.

18. Although I have also determined that Hanlin's claim for wrongful involvement in litigation should not be dismissed insofar as it states a claim for damages, it is clear that punitive damages are available only where tortious conduct has been alleged. *Drinkwater,* 563 A.2d at 776. Because Count VII does not assert an

*Maine,* 562 A.2d 656, 659 (Me.1989) (quoting *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985)). *See also Drinkwater v. Patten Realty Corp.,* 563 A.2d 772, 776 (Me.1989) (punitive damages unavailable under Maine law for breach of contract). If my recommended decision is accepted, only one of Hanlin's tort claims—the strict-liability claim (Count X)—will survive IMC's motion for judgment on the pleadings.[18] I conclude, however, that under Maine law Hanlin cannot recover punitive damages on its strict-liability claim.

The Law Court has determined that, because the purpose of punitive damages is the deterrence of "truly reprehensible conduct," *Tuttle,* 494 A.2d at 1361, such damages will be available only if the defendant acted with actual or implied malice, *id.* Strict liability for abnormally dangerous activity is, however,

not based upon any intent of the defendant to do harm to the plaintiff or to affect his interests, nor is it based upon any negligence, either in attempting to carry on the activity itself in the first instance, or in the manner in which it is carried on. The defendant is held liable although he has exercised the utmost care to prevent the harm to the plaintiff that has ensued.

*Restatement (Second) of Torts* § 519, comment d (1977). Given the nature of strict liability for abnormally dangerous activity, I conclude that the Law Court would hold that punitive damages are not available for this strict-liability claim.

## VI. ATTORNEY FEES

■ IMC claims that Hanlin is not entitled to attorney fees incurred in establishing a right to indemnification under the purchase agreement or pursuing its various tort claims.[19] It makes the following

independent tort claim, Hanlin cannot recover punitive damages for wrongful involvement in litigation.

19. I read IMC's memoranda as arguing that Hanlin is not entitled to attorney fees incurred *in bringing this action. See* Memorandum of International Minerals & Chemical Corporation in Support of its Motion for Judgment on the Pleadings at 16–19. IMC does not argue that

two arguments in support of its claim that attorney fees are not available in connection with Hanlin's asserted right to indemnification in this action: First, under Maine law the allowance of attorney fees under indemnification agreements is limited to the defense of the claim indemnified against and does not extend to costs incurred in establishing the right of indemnity. Second, the indemnification provisions of the purchase agreement do not contain an express contractual duty to defend or to pay the costs of enforcing an obligation.

Clearly Ohio law is applicable to the construction of the indemnification clauses of the purchase agreement. *See supra* at 929 n. 3. Under Ohio law an indemnitor who wrongfully refuses to defend an action against an indemnitee "is liable for the costs, including attorney fees and expenses, incurred by the indemnitee in defending the initial action *and* in vindicating its right to indemnity in a third-party action brought against an indemnitor." *Allen v. Standard Oil Co.*, 2 Ohio St.3d 122, 443 N.E.2d 497, 500 (1982) (emphasis supplied). In *Worth v. Aetna Casualty & Sur. Co.*, 32 Ohio St.3d 238, 513 N.E.2d 253 (1987), the Ohio Supreme Court explained the rationale of that court's decision in *Allen:*

> The underlying rationale of our decision in *Allen* was that where a party agrees to hold another harmless, the party seeking to enforce the terms of the indemnity agreement may be made whole by proceeding against the party who failed to abide by the terms of the agreement, and such recovery may include attorney fees.

*Id.*, 513 N.E.2d at 257.[20] *See also Sun Petroleum Products Co. v. Millwrights &* *Mach. Erectors, Local 1393,* 114 L.L.R.M. (BNA) 2624 (N.D.Ohio 1983) (indemnification contract which provided that indemnitee would be held harmless from any and all damages arising directly or indirectly from labor dispute held to entitle indemnitees to an award of attorney fees for time spent defending the original action against them and in establishing their right to indemnification from indemnitor).

Section 7.06 of the purchase agreement provides, in relevant part, that "IMC will indemnify and hold harmless LCP from any and all loss or damage arising in connection with any ... liability [arising from or related to the operation of the Business by IMC], including legal and other expenses reasonable incurred in connection therewith." Purchase Agreement § 7.06. Section 12.11 similarly provides, in relevant part:

> IMC hereby agrees to indemnify and hold harmless LCP, and anyone claiming under LCP, from and against any and all claims, expenses and damages, including all legal and other costs of defense thereof, arising from or related to any and all contamination of land, air or surface or ground water....

*Id.* § 12.11 The rationale of *Allen,* as explained in *Worth,* applies to this case in which Hanlin alleges that IMC has refused to honor its indemnity undertaking and seeks to be made whole for the expenses, including attorney fees, incurred in establishing a right of indemnification. I therefore conclude that Hanlin's claim for attorney fees should not be dismissed.[21]

Hanlin is not entitled to attorney fees incurred in defending the RCRA order. Thus, this issue is not now before the court and I do not address it in my recommended decision.

**20.** In *Worth* the court held that an indemnity agreement which expressly allows for the recovery of attorney fees should be construed (as was the indemnity agreement in *Allen* which did not expressly allow for the recovery of such expenses) to require the recovery of legal expenses incurred in establishing a right to indemnity.

**21.** IMC apparently reads Count VII (Wrongful Involvement in Litigation) as seeking attorney fees incurred in bringing this action even though such fees are requested only in connection with Hanlin's efforts to establish a right to indemnification under the purchase agreement. Complaint, Prayer for Relief ¶ 8. Were such fees sought by Hanlin, clearly they would be disallowed under the American Rule. *Restatement (Second) of Torts* § 914(1) (1979). *See also Gagnon,* 271 A.2d at 635 (rule allowing recovery of attorney fees incurred as the result of defendant's wrongful involvement of plaintiff in litigation does not extend to attorney fees incurred in litigation between plaintiff and defendant).

940

## VII. CONCLUSION

For the foregoing reasons, I recommend that IMC's motion for judgment on the pleadings be GRANTED as to Count VIII (Continuing Nuisance), Count IX (Continuing Trespass) and those portions of Counts VII (Wrongful Involvement in Litigation) and X (Strict Liability for Abnormally Dangerous and Ultrahazardous Activities) which assert claims for punitive damages, and that the motion in all other respects be DENIED.

Dated at Portland, Maine this 26th day of July, 1990.